******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JIM FEEHAN *v.* RICK MARCONE ET AL.
(SC 20216)
(SC 20217)
(SC 20218)


Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

Pursuant to the elections clause of the Connecticut constitution (art. III, § 7), the state House of Representatives "shall be the final judge of the election returns and qualifications of its own members."

Pursuant to statute (§ 9-319), votes for state representatives "shall be canvassed, during the month in which they are cast," by the treasurer, the secretary of the state and the comptroller, "and they shall declare, except in case of a tie vote, who is elected . . . representative" in each assembly district.

The plaintiff, the endorsed republican candidate for the office of state representative in the November, 2018 election for the 120th assembly district, sought certain relief in connection with an alleged mistake at a multidistrict polling place whereby approximately seventy-six voters were given ballots that were intended for use in the 122nd assembly district and the opposing democratic candidate, the intervening defendant Y, received only thirteen more votes than the plaintiff. In addition to seeking declaratory relief, the plaintiff sought a mandatory injunction requiring a new election and a prohibitive injunction preventing the three state defendants, the treasurer, the secretary of the state, and the comptroller, from declaring a winner. The plaintiff subsequently amended his complaint to include federal statutory (42 U.S.C. § 1983) claims alleging the deprivation of certain federal constitutional rights and filed an application for an order temporarily enjoining the state defendants from canvassing votes or declaring the results of such canvass. Y moved to dismiss the plaintiff's amended complaint for lack of jurisdiction, arguing that, under the elections clause of the Connecticut constitution, the state House of Representatives has exclusive jurisdiction to resolve disputes regarding the election of its own members. The plaintiff objected, contending, inter alia, that the trial court had jurisdiction pursuant to the statute (§ 9-328) governing contested municipal elections. The trial court granted Y's motion to dismiss with respect to the claims for declaratory relief and a mandatory injunction. The court nevertheless granted the plaintiff's motion for a temporary injunction, precluding the state defendants from canvassing the votes or declaring a winner, in order to maintain the status quo until the House of Representatives was provided with an opportunity to exercise its authority. Thereafter, the plaintiff, the state defendants, and Y, upon certification by the Chief Justice pursuant to statute (§ 52-265a) that a matter of substantial public interest was involved, filed separate interlocutory appeals. *Held*:

1. The trial court properly dismissed the plaintiff's claims for declaratory relief and for a mandatory injunction requiring a new election: this court examined the factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing state constitutional provisions and concluded that the elections clause afforded the state House of Representatives exclusive jurisdiction over the plaintiff's election challenge, as Connecticut case law analyzing that provision, federal and sister state case law analyzing other, analogous constitutional provisions, historical concerns regarding the separation of powers attendant to adoption of the 1818 constitution, the existence of statutes authorizing courts to hear election contests in contexts other than state legislative elections, and the adoption of a rule in the state House of Representatives establishing a committee on contested elections all indicated that the legislature's exclusive jurisdiction in matters regarding the election of its own members was not, as the plaintiff argued, limited to the mere vetting of arithmetic in tallying the votes cast; moreover, § 9-328 did not afford state courts jurisdiction over the plaintiff's claims, this court having concluded that the applicable

statutory (§ 9-1 [h]) definition of municipal election limits such contests to the election of public officials of a municipality, that the plaintiff's reliance on a separate statutory (§ 9-372 [7]) definition of municipal office, which includes those officials elected by voters within a single municipality, was misplaced because § 9-328 was not within the exclusive list of statutes to which the definition of municipal office set forth in § 9-372 (7) applied, and that the construction of § 9-238 urged by the plaintiff would yield absurd results by authorizing different treatment of state legislative elections depending on whether an assembly district is located in one town or multiple towns; furthermore, this court declined to address whether the supremacy clause of the United States constitution would override the elections clause of the Connecticut constitution with respect to the jurisdiction of the courts to entertain federal constitutional claims arising from state legislative elections because, in the absence of the plaintiff's allegation of intentional misconduct on the part of election officials, he had failed to sufficiently plead such a violation under standards set forth in applicable federal case law.

2. The trial court lacked jurisdiction to grant the plaintiff's application for a temporary injunction, and, accordingly, the trial court's granting of that application was reversed: contrary to the plaintiff's claim, the defendants' appeals from the trial court's order of injunctive relief were not rendered moot by the passage of the deadline set forth in § 9-319 because that deadline applied only to the canvassing of votes, and not to the declaration of a winner, and because § 9-319 does not contain other negative words invalidating or nullifying a late canvass or declaration; moreover, in light of this court's conclusion that the trial court lacked jurisdiction over the plaintiff's claims in the present case, the trial court also lacked jurisdiction to enjoin, even temporarily, the state defendants from canvassing the votes cast or from declaring a winner.

Argued December 21, 2018—officially released January 30, 2019*

*Procedural History*

Action for a declaratory judgment ordering that a new election be held for the office of state representative for the 120th assembly district, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where Philip L. Young III intervened as a defendant; thereafter, the court, *Bellis, J.*, granted the plaintiff's motion for an emergency temporary restraining order and granted in part the intervening defendant's motion to dismiss, and the plaintiff, the defendant Denise Merrill et al., and the intervening defendant, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest was at issue, filed separate appeals to this court. *Affirmed in part; reversed in part; judgment directed.*

*Proloy K. Das*, with whom were *Matthew A. Ciarleglio* and *Kevin W. Munn*, for the appellant in Docket No. SC 20216 and the appellee in Docket Nos. SC 20217 and SC 20218 (plaintiff).

*Michael K. Skold*, assistant attorney general, with whom, on the brief, was *George Jepsen*, former attorney general, for the appellants in Docket No. SC 20217 and the appellees in Docket Nos. SC 20216 and SC 20218 (defendant Denise W. Merrill et al.).

*William M. Bloss*, with whom were *Alinor C. Sterling* and *Emily B. Rock*, for the appellant in Docket No. SC 20218 and the appellee in Docket Nos. SC 20216 and SC 20217 (intervening defendant Philip L. Young III).

ROBINSON, C. J. These expedited public interest appeals arise from an apparent mix-up at the Bunnell High School polling place in the town of Stratford (town), where it is alleged that approximately seventy-six voters who should have received ballots for the 120th assembly district election were instead given ballots for the 122nd assembly district, rendering those voters unable to vote for their assembly district's state representative. The plaintiff, Jim Feehan, who is the Republican Party's candidate for state representative in the 120th assembly district, brought this action seeking declaratory relief, a new election, and an injunction prohibiting the defendants, Secretary of the State Denise W. Merrill, Treasurer Denise L. Nappier, and Comptroller Kevin Lembo (state defendants), from declaring the intervening defendant, Phillip L. Young III, the Democratic Party's candidate, as the winner of that election.[1] After the Chief Justice granted the parties' separate applications for permission to appeal pursuant to General Statutes § 52-265a, the plaintiff appealed from the judgment of the trial court dismissing the complaint in part as barred by the elections clause set forth in article third, § 7, of the Connecticut constitution,[2] and the defendants appealed from the grant of the plaintiff's application for a temporary injunction.[3] We conclude that the elections clause gives our state House of Representatives exclusive jurisdiction over this election contest, and we disagree with the plaintiff's claims that (1) General Statutes § 9-328,[4] which governs contested elections for "municipal office," confers jurisdiction on the courts over this case, and (2) under the supremacy clause of the United States constitution; see U.S. Const., art. VI, cl. 2;[5] state courts have jurisdiction over his federal constitutional claims, notwithstanding the elections clause in the Connecticut constitution. Accordingly, we also agree with the defendants' claim that the trial court lacked jurisdiction to enjoin the state defendants from canvassing the votes and declaring a winner. We, therefore, affirm the judgment of the trial court insofar as it dismissed the complaint and reverse the judgment of the trial court with respect to its issuance of a temporary injunction.

The record reveals the following facts, as alleged in the operative complaint, and procedural history. On November 6, 2018, the election for the state representative for the 120th assembly district took place. There were three candidates for that position: the plaintiff, who was endorsed by the Republican Party and the Independent Party, Young, who was endorsed by the Democratic Party, and a petitioning candidate, Prez Palmer. One of the polling places for the 120th assembly district was Bunnell High School, which also served as a polling place for the 122nd assembly district. At some point midday, a packet of ballots for the 122nd assembly

district was distributed to voters in the voting line for the 120th assembly district. As a result, approximately seventy-six voters who received those ballots were unable to cast a vote for the office of state representative from the 120th assembly district.[6] A voter detected the mistake and reported it to the moderator, who replaced the 122nd assembly district ballots with the correct ones and noted the incident in his log, allowing for investigation by the town registrar of voters after the election.

After the initial vote tabulation for the 120th assembly district, the vote count was 5217 votes for Young, 5199 votes for the plaintiff, and 55 votes for Palmer. Because there was a difference of only 18 votes between Young and the plaintiff, a statutory recanvass was required pursuant to General Statutes § 9-311a. That recanvass was held on November 13 and 14, 2018, and resulted in 5222 votes for Young and 5209 votes for the plaintiff, a difference of 13 votes. Palmer again received 55 votes.

On November 15, 2018, the plaintiff filed a complaint in the trial court, seeking the following relief: (1) "a declaration that, as a result of the errors committed at the Bunnell [High School] polling place and resulting disenfranchisement of voters in the 120th assembly district, a new election must be held for the office of state representative for the 120th [assembly] district"; (2) "a mandatory injunction requiring the defendants to hold a special election for the office of state representative in the 120th assembly district"; and (3) "a prohibitory injunction precluding [the state defendants] from declaring a candidate elected state representative in the 120th assembly district before a new election is held." The plaintiff subsequently amended that complaint to include claims pursuant to 42 U.S.C. § 1983, alleging that the voters who received incorrect ballots had been deprived of their fundamental rights to vote and to equal protection of the laws under the United States constitution. In addition, the plaintiff filed an application for a temporary injunction[7] barring the state defendants from canvassing the votes for state representative from the 120th assembly district or declaring the results of any such canvass.

After the trial court granted Young's motion for permission to intervene in the action as a defendant, he—supported by the state defendants—moved to dismiss the amended complaint[8] for lack of jurisdiction, arguing that, under the elections clause of the Connecticut constitution, our state House of Representatives has exclusive jurisdiction to resolve election disputes involving the election of its members. Young also objected to the plaintiff's application for a temporary injunction. The plaintiff objected to the motion to dismiss, contending that the trial court had jurisdiction to grant relief pursuant to § 9-328, and that he did not seek to challenge the final decision as to who won the election but, rather,

whether the election was conducted under "procedures that comply with the General Statutes and the state and federal constitutions."

After conducting a hearing on the motion to dismiss the amended complaint, the trial court granted the motion in part with respect to the plaintiff's requests for a declaration and mandatory injunction requiring a new election for the office of state representative for the 120th assembly district.[9] The court concluded that our state House of Representatives had exclusive jurisdiction over those matters pursuant to our state elections clause, even though the plaintiff had also asserted federal claims pursuant to 42 U.S.C. § 1983. The court granted, however, the plaintiff's request for a temporary injunction enjoining the state defendants from canvassing the votes or declaring the winner of the election pursuant to General Statutes § 9-319,[10] reasoning that the "limited exercise of its jurisdiction over the application" for the injunction was necessary to maintain the status quo and to "ensur[e] that the House [of Representatives] has an opportunity to exercise its authority." The trial court rendered judgment accordingly. These expedited public interest appeals pursuant to § 52-265a followed.

We held oral argument in these appeals on December 21, 2018.[11] Immediately after oral argument, we issued the following order: "After a hearing and based on the record and claims before the court, it is hereby ordered that the judgment of the trial court is affirmed insofar as it lacks jurisdiction at this time. In accordance with this determination, it is further ordered that the trial court's injunction is vacated. A written decision will follow." This is that written decision.

"A motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the plaintiff cannot as a matter of law and fact state a cause of action that should be heard by the court." (Internal quotation marks omitted.) *Giannoni* v. *Commissioner of Transportation*, 322 Conn. 344, 349, 141 A.3d 784 (2016). Thus, "[w]e begin with the standard of review and the general principles governing a trial court's disposition of a motion to dismiss that challenges jurisdiction." *Rocky Hill* v. *SecureCare Realty, LLC*, 315 Conn. 265, 276, 105 A.3d 857 (2015). "A determination regarding a trial court's subject matter jurisdiction is a question of law," particularly when it presents questions of constitutional and statutory interpretation. (Internal quotation marks omitted.) Id. Accordingly, "[o]ur review of the court's ultimate legal conclusion[s] and resulting [determination] of the motion to dismiss will be de novo. . . .

"Depending on the record before it, a trial court ruling on a motion to dismiss for lack of subject matter jurisdiction pursuant to Practice Book § 10-31 (a) (1) may decide that motion on the basis of: (1) the com-

plaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. . . . Different rules and procedures will apply, depending on the state of the record at the time the motion is filed. . . .

"If [as here] the court decides the motion on the basis of the complaint alone, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Citations omitted; internal quotation marks omitted.) Id., 276–77.

I

THE PLAINTIFF'S APPEAL

In attacking the trial court's jurisdictional conclusion, the plaintiff contends that (1) the elections clause of the Connecticut constitution does not "divest the judiciary of jurisdiction over this dispute," (2) § 9-328 provides a statutory basis for jurisdiction, and (3) the supremacy clause of the United States constitution renders inapplicable any restriction imposed by the state elections clause with respect to his federal constitutional claims brought pursuant to 42 U.S.C. § 1983. We address each of these claims in turn.

A

Whether the Elections Clause Divests State
Courts of Jurisdiction over This Case

We begin with the plaintiff's claim that the elections clause does not divest state courts of jurisdiction over this case. The plaintiff contends that the plain language of the elections clause, which makes "each house . . . the final judge of the election returns and qualifications of its own members"; Conn. Const., art. III, § 7; renders final the legislature's judgment about which candidate received the most votes during the election, but does not give the General Assembly "any authority to resolve disputes concerning the procedures employed during an election, much less [the] sole authority to do so." In support of this argument, the plaintiff relies on *Roudebush* v. *Hartke*, 405 U.S. 15, 92 S. Ct. 804, 31 L. Ed. 2d 1 (1972), and decisions of several sister state courts; see, e.g., *State ex rel. Wahl* v. *Richards*, 44 Del. 566, 64 A.2d 400 (1949); *State ex rel. Wheeler* v. *Shelby Circuit Court*, 267 Ind. 265, 369 N.E.2d 933 (1977); *State ex rel. Olson* v. *Bakken*, 329 N.W.2d 575 (N.D. 1983); *McGann* v. *Board of Elections*, 85 R.I. 223, 129 A.2d 341 (1967); *McIntyre* v. *Wick*, 558 N.W.2d 347 (S.D. 1996); in support of the "distinction between the authority to determine which candidate is entitled to be seated in the legislature (which is the purview of each house of the legislature), and the authority to decide disputes over the election process itself." The plaintiff further

argues that only the courts, and not the state House of Representatives, have the institutional authority to issue the requested equitable relief, namely, a new election. The plaintiff emphasizes that "he is not asking the court to declare him the winner of the election" but, instead, "is asking the court to remedy constitutional and statutory violations in the administration of the election . . . which is a core function of the judiciary."

In response, the defendants contend that the plaintiff's interpretation of the elections clause would "inject our courts into a General Assembly election . . . for the first time in our history" and that the state House of Representatives "is the sole entity that is constitutionally authorized to determine how such disputes shall be resolved." Relying on *State ex rel. Morris* v. *Bulkeley*, 61 Conn. 287, 23 A. 186 (1892), *Selleck* v. *Common Council*, 40 Conn. 359 (1873), and *In re Application of Mylchreest*, 6 Conn. Supp. 435 (1938), together with a decision of the United States Court of Appeals for the District of Columbia Circuit interpreting the elections clause of the United States constitution, *Morgan* v. *United States*, 801 F.2d 445 (D.C. Cir. 1986), cert. denied, 480 U.S. 911, 107 S. Ct. 1359, 94 L. Ed. 2d 529 (1987), the defendants argue that the House of Representatives—acting via its contested elections committee pursuant to House Rule No. 19—has "exclusive jurisdiction over house elections contests." See House Res. No. 2, 2019 Sess. (adopted January 9, 2019). The defendants further argue that *Roudebush* v. *Hartke*, supra, 405 U.S. 15, and the sister state cases on which the plaintiff relies are distinguishable because the courts in those cases had specific statutory authorization to act, and also had functioned ministerially to order recounts, rather than to render a "judicial finding that the election process was so unreliable that a new election should be ordered . . . ." Young then contends that Connecticut's elections clause provides the legislature with the authority to declare a vacancy and order a special election to fill it, upon a determination that the elections process was fatally flawed in this case. We agree with the defendants and conclude that the elections clause divested the courts of authority over the election contest at issue in this case.

In *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we enumerated the following six factors to be considered in construing the state constitution: "(1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. . . .

"The *Geisler* factors serve a dual purpose: they

encourage the raising of state constitutional issues in a manner to which the opposing party . . . can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only persuasive decisions." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 407–408, 119 A.3d 462 (2015); see also *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 271 n.26, 990 A.2d 206 (2010) (plurality opinion) ("the *Geisler* framework is equally useful in analyzing the scope of a right guaranteed by the state constitution that has no federal analog" [internal quotation marks omitted]); *Honulik* v. *Greenwich*, 293 Conn. 641, 648 n.9, 980 A.2d 845 (2009) ("Although we typically employ a *Geisler* analysis to determine whether a provision of our constitution affords broader individual rights than an analogous provision of the United States constitution . . . we have at times considered the *Geisler* factors in interpreting language in our constitution that does not have a similar federal counterpart. . . . We consider a structured and comprehensive approach to be helpful in either context." [Citations omitted.]).

We begin with the relevant constitutional text, which provides in relevant part: "The treasurer, secretary of the state, and comptroller shall canvass publicly the votes for senators and representatives. The person . . . in each assembly district having the greatest number of votes for representative shall be declared to be duly elected for such district. . . . The return of votes, and the result of the canvass, shall be submitted to the house of representatives and to the senate on the first day of the session of the general assembly. *Each house shall be the final judge of the election returns and qualifications of its own members.*" (Emphasis added.) Conn. Const., art. III, § 7. We note at the outset that the plaintiff does not appear to dispute that this language suggests that each house of the legislature has exclusive jurisdiction over disputes that come within the scope of the elections clause. Instead, he claims that disputes, such as that presented in this case, concerning irregularities in the conduct of the legislative election itself, rather than the correctness of the tally of the votes cast, simply do not come within the scope of that constitutional provision. Although the use of the specific phrase "election returns" may reasonably be read—as argued by the plaintiff—to suggest that the legislature's

exclusive jurisdiction is limited to vetting the state defendants' arithmetic,[12] this narrow interpretation is inconsistent with case law from Connecticut construing our state elections clause and with federal and sister state authority construing analogous constitutional provisions.

Turning to Connecticut case law, the seminal case on the elections clause is *In re Application of Mylchreest*, supra, 6 Conn. Supp. 436, in which our Superior Court concluded that, under the elections clause—then set forth within article third, § 6, of the 1818 Connecticut constitution—it is "not proper for any court to be given power to pass upon the question as to who has been elected state senator or representative." The court rejected an application for an order seeking a recount of votes in a state senate election because "a judge of the Superior Court has no jurisdiction to declare [the applicant] elected as senator [or] to issue a certificate to that effect, nor has a judge of the Superior Court jurisdiction to grant any other ultimate relief . . . . No statute authorizes a judge of the Superior Court to order a recount of votes for [s]tate [s]enator and failing that and likewise lacking jurisdiction to grant any relief which would be predicated on a finding as to what the actual vote was, such a judge has no jurisdiction either to order a recount or make such a finding." Id., 437. In so concluding, the Superior Court relied on this court's decision in *Selleck* v. *Common Council*, supra, 40 Conn. 359, which held that, by using the word "final" in legislation providing that " 'the board of councilmen . . . shall be the final judges of the election returns and of the validity of elections and qualifications of its own members' "; id., 360 (preliminary statement of facts and procedural history); the legislature "intended to divest the Superior Court of jurisdiction . . . and make the common council *the sole tribunal to determine the legality of the election* of its members." (Emphasis added.) Id., 362; see also *In re Application of Mylchreest*, supra, 436. Moreover, in *State ex rel. Morris* v. *Bulkeley*, supra, 61 Conn. 362, this court stated that, "[w]hen the people, speaking in their sovereign capacity by the constitution, appoint a single tribunal to ascertain and declare a certain result, and that tribunal does so ascertain and declare, there is no other authority that can interfere with or revise such declaration and change the result."

With respect to the constitutional history, there was "no significant debate in either 1818 or 1965" at the constitutional conventions with respect to the elections clause, which originally dates to 1818. W. Horton, The Connecticut State Constitution (2d Ed. 2012) pp. 115–16. Particularly given the importance in 1818 of the concept of the separation of powers;[13] see id., pp. 11–13; this silence directs our attention to the federal authority discussing the history of the elections clause of the United States constitution,[14] because "[w]hen the states

of the union adopted their own constitutions most followed both the substance and the procedures adopted by the founding fathers in the federal constitution." *Kinsella* v. *Jaekle*, 192 Conn. 704, 721, 475 A.2d 243 (1984). Thus, the elections clause of the Connecticut constitution, which differs only slightly from its federal counterpart, "may be understood in light of . . . federal provisions and the intent of the founding fathers . . . ." (Footnote omitted.) Id.; see also id., 717–18 (relying on history of United States constitution for historical analysis of impeachment power under 1818 constitution given that "records of the constitutional convention of 1818 do not explain the framers' reasons" for "specifically reserv[ing] the power of impeachment and removal of executive and judicial officers to the General Assembly").

Our discussion of federal authority begins with the United States Supreme Court's decision in *Roudebush* v. *Hartke*, supra, 405 U.S. 15, upon which the plaintiff relies heavily. In that case, the Supreme Court considered whether Indiana's state statutory recount procedure was a valid exercise of the state's power to prescribe the time, place, and manner of holding an election pursuant to article one, § 4, of the United States constitution[15] or, instead, was an unconstitutional infringement on the United States Senate's power under the elections clause of the United States constitution; see footnote 14 of this opinion; to judge the election returns for its own members. See *Roudebush* v. *Hartke*, supra, 23–24. The court acknowledged that "a [s]tate's verification of the accuracy of election results pursuant to its [article one, § 4 powers] is not totally separable from the Senate's power to judge elections and returns." Id., 25. The court concluded, however, that "a recount can be said to 'usurp' the Senate's function *only if it frustrates the Senate's ability to make an independent final judgment*. A recount does not prevent the Senate from independently evaluating the election any more than the initial count does. The Senate is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount." (Emphasis added; footnotes omitted.) Id., 25–26. Accordingly, the court concluded that Indiana's statutory recount procedure was constitutional. Id., 26; see also *McIntyre* v. *Fallahay*, 766 F.2d 1078, 1086 (7th Cir. 1985) (noting that "states may give advice" to Congress regarding apparent winner of election "in accordance with their own rules," although Congress may ignore that advice); *Durkin* v. *Snow*, 403 F. Supp. 18, 20 (D.N.H. 1974) (under *Roudebush*, New Hampshire statute authorizing recount procedure for election for office of United States senator was constitutional); *Franken* v. *Pawlenty*, 762 N.W.2d 558, 562–63 (Minn. 2009) (state statute authorizing court to make findings and conclusions as to which party received highest number of votes in election for United States senator did not violate federal

elections clause).

We read *Roudebush* to hold only that state legislatures have *constitutional* authority pursuant to article one, § 4, of the United States constitution to enact their own laws for the purpose of verifying the accuracy of the results in Congressional elections, subject to the right of each house of Congress to make a final determination on that issue. *Roudebush* does not stand for the proposition that the elections clause affords the courts an inherent role in resolving a dispute over a legislative election, particularly in the absence of statutory authority to do so. Instead, post-*Roudebush* federal case law interpreting the elections clause of the United States constitution even more clearly supports the exclusivity of the legislative branch's jurisdiction to determine the lawfulness of an election to that body. The leading case on this point is the decision of the District of Columbia Circuit in *Morgan* v. *United States*, supra, 801 F.2d 445. In an opinion written by then Judge Antonin Scalia, the court concluded that the elections clause deprived it of "jurisdiction to review the substance or procedure of a determination by the [United States] House of Representatives that one of two contestants was lawfully elected to that body." Id. The court concluded that it lacked subject matter jurisdiction over numerous constitutional and federal claims brought to challenge the party line decision of the House of Representatives— following a task force investigation and recount—to reject a state recount declaring the Republican candidate the winner and to seat, instead, the Democratic candidate. Id., 446. Following *Roudebush*, the court concluded that it lacked jurisdiction over these claims because the elections clause of the United States constitution "unambiguously proscribes judicial review of the proceedings in the House of Representatives that led to the seating of" the Democratic candidate and that it would be "difficult to imagine a clearer case of 'textually demonstrable constitutional commitment' of an issue to another branch of government to the exclusion of the courts[16] . . . than the language of [the federal elections clause], that '[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members.' The provision states not merely that each House 'may judge' these matters, but that each House 'shall be *the* Judge' . . . . The exclusion of others—*and in particular of others who are judges*—could not be more evident. Hence, without need to rely upon the amorphous and partly prudential doctrine of 'political questions,' . . . we simply lack jurisdiction to proceed."[17] (Citations omitted; emphasis altered; footnote added.) Id., 446–47.

Significant to our historical analysis under *Geisler* is the court's observation in *Morgan* that the "history of the [federal elections clause] is entirely consistent with its plain exclusion of judicial jurisdiction. In the formative years of the American republic, it was the uniform

practice of England and America for legislatures to be the final judges of the elections and qualifications of their members. . . . There was no opposition to the [e]lections [c]lause in the [f]ederal [c]onstitutional [c]onvention . . . and the minor opposition in the ratification debates focused upon the clause's removal of final authority not from the *courts*, but from the state legislatures, where the Articles of Confederation had vested an analogous power. . . . It is noteworthy that none of the responses to the opposition mentions the safeguard of judicial review. Such a safeguard was evidently unthinkable, since the determination of the legislative House was *itself* deemed to be a *judicial* one." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 447. The court cited James Kent for the proposition that the legislature, in judging election returns and the qualification of its members, acts in a " 'a judicial character' " and that such decisions, " '*like the decisions of any other court of justice*, ought to be regulated by known principles of law, and strictly adhered to, for the sake of uniformity and certainty.' " (Emphasis altered.) Id., citing 1 J. Kent, Commentaries on American Law (8th Ed. 1854) p. 248. Thus, the court further emphasized that the federal elections clause's "command to 'be the Judge of . . . Elections' excludes other judges." *Morgan* v. *United States*, supra, 801 F.2d 450; see also *McIntyre* v. *Fallahay*, supra, 766 F.2d 1082 ("[I]t is inappropriate for a federal court even to intimate how Congress ought to have decided" an election dispute because "[t]he House is not only 'Judge' but also final arbiter. Its decision about which ballots count, and who won, [is] not reviewable in any court.").

Turning to a review of the sister state decisions, we note that the "almost universal constitutional doctrine in the United States and the several states which have constitutions containing this or similar provisions is that . . . [e]ach legislative body is the sole judge of the elections, returns, and qualifications of its own members, and its action in admitting or expelling a member is not reviewable in the courts. Furthermore, a statute which requires a court to inquire into the commission of corrupt practices in the election of a member of the legislature is not constitutional."[18] (Internal quotation marks omitted.) *Foster* v. *Harden*, 536 So. 2d 905, 906 (Miss. 1988), overruled on other grounds by *Dillon* v. *Myers*, 227 So. 3d 923 (Miss. 2017). Thus, consistent with the District of Columbia Circuit's decision in *Morgan*, the vast majority of our sister states hold that courts lack jurisdiction to entertain a contest pertaining to a legislative election, particularly in the absence of statutory authorization to do so. See *Beatty* v. *Myrick*, 218 Ga. 629, 629, 129 S.E.2d 764 (1963) (trial court lacked jurisdiction over "equitable action in which the plaintiffs seek to have adjudicated which of two named candidates was legally elected to represent" state senate district because state constitution's elec-

tions clause "vested [state senate] with exclusive power to adjudge the qualifications of its own members"); *Stephenson* v. *Woodward*, 182 S.W.3d 162, 168–69 (Ky. 2005) (rejecting argument under state constitution's elections clause that court lacked subject matter jurisdiction to entertain challenge to candidate's qualifications to appear on ballot, filed *before* election, because it "does not involve an election contest," namely, a "[postelection] procedure involving an election that has been held," as authorizing statute did not require adjudication of dispute before election);[19] *Wheatley* v. *Secretary of Commonwealth*, 439 Mass. 849, 853 and n.8, 792 N.E.2d 645 (2003) (concluding that court lacked authority under state constitution's elections clause to order new election in light of decision by state house of representatives to seat candidate, but "express[ing] no opinion whether any differences in those facts, sequence of events, or procedural history might have affected the outcome of [the] proceedings"); *Scheibel* v. *Pavlak*, 282 N.W.2d 843, 847–48 (Minn. 1979) (observing that, under state constitution's elections clause, courts' statutory jurisdiction over legislative election contests left state supreme court without "jurisdiction to issue a final and binding decision in [the] matter, and our opinion by statute will be and by the [state constitution] must only be advisory to the [state] House of Representatives," but leaving for another day constitutionality of that question under separation of powers and preclusion on advisory opinions); *Dillon* v. *Meyers*, 227 So. 3d 923, 927–28 (Miss. 2017) (concluding that state constitution's elections clause "places judging the election of members of the [l]egislature in the [l]egislature's bailiwick," for purposes of "general [or special] elections," with separate constitutional clause governing party primaries and "requir[ing] the [l]egislature to enact laws to secure fairness in primary elections," operating to afford state courts jurisdiction over legislative primary election dispute); *Gammage* v. *Compton*, 548 S.W.2d 1, 5 (Tex. 1977) (rejecting reliance on *Roudebush*, and construing statute giving state court "original and exclusive jurisdiction of all contests of elections, general or special, for all school, municipal, precinct, county, district, state offices, or federal offices" as inapplicable to federal congressional elections because of federal elections clause).

A separate line of sister state cases holds, consistent with *Roudebush*, that state legislatures may enact statutes setting forth procedures by which the vote may be tabulated and, in the case of close elections, retabulated, in elections for state legislative office—provided that those statutes do not impinge on the ultimate constitutional right and obligation of the legislative body to judge the election returns for its own members.[20] See *Meyer* v. *Lamm*, 846 P.2d 862, 870 (Colo. 1993) ("proceedings involving recounts of election results which are inherently tentative and are not final or con-

clusive, and in which recounts are conducted pursuant to the election laws prior to the certification by the secretary of state that a person has been duly elected, are not 'election contests' " for purpose of state constitution's elections clause); *State ex rel. Wheeler* v. *Shelby Circuit Court*, supra, 267 Ind. 268 (statute requiring court to order and superintend recount involving state legislative office did not impinge on legislature's authority under elections clause because recount is not binding and "is merely an extension of this voting process and has been provided for by the legislature in an effort to [ensure] the correctness of the vote count"); *Rice* v. *Power*, 19 N.Y.2d 106, 108, 224 N.E.2d 865, 278 N.Y.S.2d 361 (1967) (statute conferring jurisdiction on court to order recanvass of ballots in order to ensure "that the certificate reflect[s] an accurate tally of the votes cast" did not impinge on constitutional authority of constitutional convention to judge election returns of its members when convention remained free to disregard certificate of election); *Williamson* v. *State Election Board*, 431 P.2d 352, 355–56 (Okla. 1967) (court has constitutional authority to enforce statutory recount procedure by order of mandamus); *McIntyre* v. *Wick*, supra, 558 N.W.2d 356–57 (concluding that statute conferring power on state supreme court to review procedures of judicially appointed recount boards that was "necessary to guard against irregularities and errors in the tabulation of votes and [to verify] the accuracy of elections results" did not violate elections clause because court "lack[ed] . . . any jurisdiction to dictate the final determination of a legislative election," and noting that its "review of a recount and judgment in such a proceeding merely constitutes evidence" [footnote omitted]).

In our view, these recount cases are distinguishable because a recount is a process that requires the ministerial action of tallying the votes cast—thus ensuring the accuracy of the vote tally that the legislature is ultimately to consider—rather than finding facts in a judicial manner with respect to the fairness or legality of the underlying elections process. See *Young* v. *Mikva*, 66 Ill. 2d 579, 584–85, 363 N.E.2d 851 (1977) (distinguishing *Roudebush* as upholding constitutionality of administrative recount of ballots under state procedures, rather than sanctioning election contest for congressional seat); *Lamb* v. *Hammond*, 308 Md. 286, 303–304, 518 A.2d 1057 (1987) (concluding that state constitution did not preclude jurisdiction over action based "upon a timely complaint that canvassing officials have improperly refused to canvass votes that were lawfully cast," and that "the appropriate court . . . may inquire into the matter, determine whether the administrative officials have carried out their ministerial duties in accordance with the law, and, if they have not, command them to do so," because this exercise of jurisdiction was "complementary" of legislature's jurisdiction

over election contests under state elections clause); *McIntyre* v. *Wick*, supra, 558 N.W.2d 356 n.7 (distinguishing "election contest," which "relates to a determination of the election," from "[a] recount [that] is addressed only to the correct determination of the true and actual count of the ballots cast," and noting that "[d]uties in connection with a recount . . . are more in the nature of a ministerial or administrative function than a judicial or determinative function").

The plaintiff raises several prudential arguments to bolster his interpretation of the elections clause that would allow the exercise of jurisdiction by the courts over legislative election disputes. He contends that the courts must have jurisdiction over disputes involving the election process because only they have the authority to grant the relief that he is requesting, namely, a new election. In support of this claim, he relies on the statement of the North Dakota Supreme Court in *State ex rel. Olson* v. *Bakken*, supra, 329 N.W.2d 579, that "the [l]egislature is not in a position to provide any affirmative equitable remedy. The [l]egislature could reject the 'election' of a legislator which may put into operation certain provisions of the [state] [c]onstitution and statutes resulting in the [g]overnor calling a special election. But other affirmative equitable remedies would not be available." See also *McIntyre* v. *Wick*, supra, 558 N.W.2d 356 n.7 (describing "dearth of affirmative equitable remedies available from the legislature for irregularities in the election process"). Second, the plaintiff relies on the South Dakota Supreme Court's observation in *McIntyre*, supporting the complementary exercise of jurisdiction over election challenges by the courts and the legislature, that the "legislature is not normally in session when the general election is held. Consequently, considerable confusion and delay would result if the above superintending responsibilities were borne exclusively by the legislature." Id., 356; see *State ex rel. Olson* v. *Bakken*, supra, 578 (same). These arguments bring us, then, to the *Geisler* factor requiring us to consider the public policy aspects of the constitutional question.

First, we disagree with the plaintiff's reliance on the North Dakota decision in *State ex rel. Olson* v. *Bakken*, supra, 329 N.W.2d 579. That decision is an outlier in that it is one of the very few in which a state court has held that a state constitutional provision analogous to our elections clause does not confer *exclusive* jurisdiction on each legislative house to judge the elections returns for its own members.[21] Moreover, the court in *Bakken* cited no authority in support of its statement that the *only* relief that a legislative house can provide when exercising its power to judge election returns is the rejection of a member and the scheduling of a special election. Finally, *Bakken* is squarely distinguishable because, unlike in the present case, that court had the benefit of a broadly worded election contest statute to

support its exercise of jurisdiction.[22] Accordingly, we conclude that *Bakken* is of minimal persuasive value.

Instead, we find telling, as a public policy matter, the absence of a statute authorizing elections contests in state legislative elections, when the legislature has provided such a statute for virtually every other state, federal, and municipal election. See General Statutes § 9-323 (election of presidential electors, United States senator, and United States representative); General Statutes § 9-324 (election of probate judges and governor, lieutenant governor, secretary of the state, treasurer, attorney general, and comptroller); General Statutes § 9-328 (municipal officers and justice of peace); General Statutes § 9-329a (primary elections). The General Assembly has simply passed no statute sharing its authority over general legislative elections with the courts. Insofar as the legislature has "primary responsibility in pronouncing the public policy of our state"; (internal quotation marks omitted) *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 438; we do not presume to fill this gap in our statutory scheme, particularly given the questionable constitutionality of doing so.[23] See footnote 20 of this opinion.

Instead, our state House of Representatives has thus far addressed this gap in the election contest statutory scheme by adopting House Rule No. 19 to implement its constitutional function of judging the elections returns for its own members. The current version of House Rule No. 19 provides: "At the opening of each session a committee on contested elections, consisting of four members, at least two of whom shall be members of the minority party in the House, shall be appointed by the speaker to take into consideration all contested elections of the members of the House and to report the facts, with their opinion thereon in a manner that may be directed by House resolution." House Res. No. 2, 2019 Sess. (adopted January 9, 2019). Inasmuch as proceedings pursuant to House Rule No. 19 are "in a judicial character"; (emphasis omitted; internal quotation marks omitted) *Morgan* v. *United States*, supra, 801 F.2d 448; we understand the committee, and our state House of Representatives as a whole acting pursuant to the opinion of the committee, to have all of the powers that a judicial body would have. The exercise of this judicial power "necessarily involves the ascertainment of facts, the attendance of witnesses, the examination of such witnesses, with the power to compel them to answer pertinent questions, to determine the facts and apply the appropriate rules of law, and, finally, to render a judgment *which is beyond the authority of any other tribunal to review*."[24] (Emphasis in original; internal quotation marks omitted.) Id. Accordingly, in the absence of a rule, statute, or constitutional provision otherwise limiting the state House of Representatives' remedial authority, we can see no reason why it—sitting as a quasi-judicial body—would

lack that authority to order equitable remedies, including a new election, upon receipt of the committee's report.[25] See P. Salamanca & J. Keller, "The Legislative Privilege To Judge the Qualifications, Elections, and Returns of Members," 95 Ky. L.J. 241, 338 (2007) (describing Senate's "pragmatic step of declaring [New Hampshire] seat vacant" when, in "closest [United States] Senate race in history, the Senate decided that it could not satisfactorily determine [who] had prevailed, yet no one had established that the two [candidates] had received the same number of votes" [footnote omitted]). We conclude, therefore, that, as a public policy matter, legislative election contests are "an adequate and constitutional remedy . . . ." *Gammage* v. *Compton*, supra, 548 S.W.2d 4.

Our review of the *Geisler* factors leads us to conclude that the elections clause affords the state House of Representatives exclusive jurisdiction over the plaintiff's election challenge in this case, particularly in the absence of legislation sharing that jurisdiction with the courts in some way. We are, however, cognizant of the seriousness of the plaintiff's allegations in this case, insofar as the alleged distribution of the wrong ballots could have deprived numerous electors of their right to cast a vote for their state representative, and that the margin was small enough that the alleged error might have affected the outcome of the election. Given the seriousness of those claims, and its exclusive jurisdiction under the elections clause, we "must presume that the members of the General Assembly will carry out their duties with scrupulous attention to the laws under which they serve. [W]e must and should presume that any officer of the state . . . will act lawfully, correctly, in good faith and in sincerity of purpose in the execution of his [or her] duties."[26] (Footnote omitted; internal quotation marks omitted.) *Kinsella* v. *Jaekle*, supra, 192 Conn. 729; see also General Statutes § 1-25 (prescribing identical oath to uphold Connecticut and federal constitutions for judges and members of General Assembly). Accordingly, we conclude that exclusive jurisdiction over the plaintiff's claims in the present case lies with our state House of Representatives.[27]

B

Whether General Statutes § 9-328 Confers
Jurisdiction in This Case

We next address the plaintiff's contention that, even if the elections clause deprives the court of inherent jurisdiction to entertain the plaintiff's complaint seeking a new election, it nevertheless has jurisdiction pursuant to § 9-328, which governs election contests for "municipal office." In particular, the plaintiff relies on the broad wording of § 9-328, which extends to "*any* municipal office," and argues that it applies to the election of the state representative for the 120th assembly district because only the electors of the town may vote

in that election, thus rendering that seat a municipal office as that term is defined by General Statutes § 9-372 (7).[28] The plaintiff also posits that § 9-328 is applicable because the parties have "consistently treated this election as one for a 'municipal office,' " given that the "candidates followed the statutory nomination procedure applicable to 'municipal offices' " because the 120th assembly district is limited to a single town.

In response, the defendants contend that § 9-328 does not apply because the office of state representative for the 120th assembly district is not a "municipal office." They contend that the statutory scheme plainly and unambiguously establishes that § 9-328 is inapplicable because it pertains only to "municipal elections," as defined by General Statutes § 9-1 (h) and (i), which are elections for the "public officials of such municipality," with "municipality" defined as "any city, borough or town within the state." (Internal quotation marks omitted.) To this end, the defendants rely on, inter alia, *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 55 A.3d 251 (2012), and argue that the definition of "municipal office" set forth in § 9-372 (7) is expressly inapplicable in this case by its own terms. The defendants contend that the plaintiff's construction would lead to a "mystifyingly absurd and likely unconstitutional result," namely, that "individuals in a single town assembly district would be able to seek judicial review of alleged election irregularities under § 9-328, while candidates and electors in multitown assembly districts would have no such remedy. Such differential treatment of individuals based solely on where they happen to live plainly is not what the legislature provided or intended."[29] We agree with the defendants and conclude that an election for a house seat is not one for a "municipal office" subject to challenge pursuant to § 9-328.

Whether the office of state representative for the 120th assembly district is a "municipal office" for purposes of jurisdiction under § 9-328 "presents a question of statutory construction over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the

legislative policy it was designed to implement, and to its relationship to existing legislation and common-law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . Previous case law interpreting the statute remains instructive, because we do not write on a clean slate when this court previously has interpreted a statute . . . .” (Citation omitted; internal quotation marks omitted.) *Marchesi* v. *Board of Selectmen*, 328 Conn. 615, 627–28, 181 A.3d 531 (2018).

We begin with the text of § 9-328, which provides in relevant part that “[a]ny elector or candidate claiming to have been aggrieved by any ruling of any election official in connection with an election for *any municipal office* . . . may bring a complaint to any judge of the Superior Court for relief therefrom.” (Emphasis added.) The plaintiff relies on § 9-372 (7), which provides: “ ‘Municipal office’ means an elective office for which only the electors of a single town, city, borough, or political subdivision, as defined in subdivision (10) of this section, may vote, including the office of justice of the peace.”[30] Reading the statutory scheme as a whole, we conclude that the plaintiff’s reliance on the definition of “municipal office” in § 9-372 (7) is misplaced and that § 9-328 plainly and unambiguously does not apply to state legislative races, even those for seats located within the boundaries of a single municipality.

Turning first to the inapplicability of § 9-372 (7), we observe that the legislature expressly limited the applicability of that definition to cases that do *not* include election contests. Section 9-372 expressly provides that the definitions set forth in that statute apply to “chapter [153], chapter 157 and sections 9-51 to 9-67, inclusive, 9-169e, 9-217, 9-236 and 9-361 . . . .” We have held that this itemization in § 9-372 is exclusive. Specifically, in construing the ballot ordering statute, General Statutes § 9-249a, we recently concluded that the “definitions in § 9-372 . . . do not, by their own terms, apply to the ballot ordering statute. Indeed, § 9-249a is conspicuously absent from the list of statutes to which the definitions in § 9-372 apply. Unless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive.” (Footnote omitted; internal quotation marks omitted.) *Republican Party of Connecticut* v. *Merrill*, supra, 307 Conn. 492–93; see also id., 494 (“[t]hus, in 2010, the Working Families Party was a ‘minor party’ for the purposes of [General Statutes] § 9-453t, which permitted it to cross endorse a major party candidate, but not a ‘minor party’ under the § 9-372 definition, which does not govern the section we are called on to interpret”). Because § 9-328 is contained in chapter 149 of the General Statutes, and therefore not in the chapters or sections listed in § 9-372, the definition of “municipal office” contained in

§ 9-372 (7), by its own unambiguous terms, does not apply to § 9-328.[31] See, e.g., *DeNunzio* v. *DeNunzio*, 320 Conn. 178, 194, 128 A.3d 901 (2016) ("[u]nder the doctrine of expressio unius est exclusio alterius—the expression of one thing is the exclusion of another— we presume that when the legislature expresses items as part of a group or series, an item that was not included was deliberately excluded").

Rather, the applicable definition is set forth in General Statutes § 9-1, which is the broader definitional provision applicable to the elections statutes contained in title 9 of the General Statutes, which contains both chapter 149 and § 9-372 of the General Statutes "[e]xcept as otherwise provided . . . ." Section 9-1 (h) provides that " '[m]unicipal election' means the regularly recurring election held in a municipality at which the electors of the municipality choose *public officials of such municipality* . . . ." (Emphasis added.) In ordinary usage, a state representative is not a "public [official] of a municipality," such as a mayor, first selectman, or council member, but *is* a public official of an assembly district. Although § 9-328 does not use the phrase "municipal election" but, instead, uses the phrase "election for any municipal office," it is reasonable to conclude that the legislature intended that, for purposes of that statute, a "municipal office" is an office occupied by a public official of a municipality, rather than a state legislative position voted in a "state election," which is defined as "the election held in the state on the first Tuesday after the first Monday in November in the even-numbered years in accordance with the provisions of the Constitution of Connecticut . . . ." General Statutes § 9-1 (s).

Beyond the plain and unambiguous statutory text, the plaintiff's construction of § 9-328 would authorize aggrieved electors and candidates for the office of state representative to bring a complaint to the trial court pursuant to § 9-328 if the assembly district was located entirely within one town, but not if the assembly district crosses town boundaries. The plaintiff has provided no explanation as to why the legislature might have wanted to authorize such different treatment of assembly districts based on this arbitrary distinction, which would also appear to run afoul of the axiom "that those who promulgate statutes . . . do not intend to promulgate statutes . . . that lead to absurd consequences or bizarre results. . . . Accordingly, [w]e construe a statute in a manner that will not . . . lead to absurd results." (Citations omitted; internal quotation marks omitted.) *Raftopol* v. *Ramey*, 299 Conn. 681, 703, 12 A.3d 783 (2011). Moreover, given the constitutional concerns created by this distinction, from the perspective of both the equal protection and elections clauses, we also rely on the proposition that "statutes are to be read so as to avoid, rather than to create, constitutional questions." *In re Valerie D.*, 223 Conn. 492, 534, 613 A.2d 748

(1992). Given that the legislature has enacted election contest statutes unambiguously addressing every other state and federal elected position,[32] we conclude that it similarly would have used unambiguous language to address this point had it intended to allow legislative election contests only in certain assembly districts.[33] Accordingly, we conclude that the office of state representative for the 120th assembly district is not a "municipal office" for purposes of § 9-328 and that, therefore, that statute does not confer jurisdiction over this case on the courts.[34]

C

Whether State Courts Have Jurisdiction over the
Plaintiff's Federal Constitutional Claims,
Regardless of the State Elections Clause

We next address the plaintiff's claim that the trial court had jurisdiction to entertain his complaint because he brought a claim pursuant to 42 U.S.C. § 1983, alleging due process and equal protection violations under the federal constitution. See *Bush* v. *Gore*, 531 U.S. 98, 104–105, 121 S. Ct. 525, 148 L. Ed. 2d 388 (2000) ("[h]aving once granted the right to vote on equal terms, the [s]tate may not, by later arbitrary and disparate treatment, value one person's vote over that of another"); *Baker* v. *Carr*, 369 U.S. 186, 208, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962) ("[a] citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the [c]onstitution"). Relying on, inter alia, *Sullins* v. *Rodriguez*, 281 Conn. 128, 913 A.2d 415 (2007), and *Fetterman* v. *University of Connecticut*, 192 Conn. 539, 473 A.2d 1176 (1984), the plaintiff further contends that, under the supremacy clause of the United States constitution, "state law defenses [such as lack of jurisdiction under article third, § 7, of the state constitution] cannot be asserted against federal constitutional claims . . . ." In response, the defendants rely on the decisions of the United States Court of Appeals for the Second Circuit in *Shannon* v. *Jacobowitz*, 394 F.3d 90 (2d Cir. 2005), and *Powell* v. *Power*, 436 F.2d 84 (2d Cir. 1970), and contend that the plaintiff has not made a colorable claim of a federal constitutional violation because he has alleged only errors in the conduct of the election, rather than an intentional act by a government official directed at impairing a citizen's right to vote. Assuming that the supremacy clause of the United States constitution would override the divestiture of jurisdiction by the elections clause in the Connecticut constitution with respect to federal constitutional claims arising from a state legislative election, we conclude that the plaintiff nevertheless has not sufficiently pleaded federal constitutional claims.[35]

In considering claims of federal law, it is well settled that, when the United States Supreme Court has not spoken, we find decisions of the Second Circuit particu-

larly persuasive. See, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 444 n.41, 125 A.3d 920 (2015); *Schnabel* v. *Tyler*, 230 Conn. 735, 742–43, 646 A.2d 152 (1994). "In deciding to adopt the analysis of the Second Circuit . . . we recognize that the decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute. This is particularly true in 42 U.S.C. § 1983 cases, where the federal statute confers concurrent jurisdiction on the federal and state courts." (Internal quotation marks omitted.) *Schnabel* v. *Tyler*, supra, 743 n.4. This avoids the "bizarre result" that would occur if we adopted one standard, "when in another courthouse, a few blocks away, the federal court, being bound by the Second Circuit rule," followed a different standard. (Internal quotation marks omitted.) Id. "We do not believe that when Congress enacted the concurrent jurisdiction provision of § 1983 that it intended to create such a disparate treatment of plaintiffs depending on their choice of a federal or state forum." (Internal quotation marks omitted.) Id.

The Second Circuit has stated that the "right to vote is regarded as a fundamental political right . . . preservative of all rights. . . . As the citizen's link to his laws and government . . . the right to vote is at the heart of our democracy. . . .

"'Principles of federalism limit the power of federal courts to intervene in state elections, however. . . . The [c]onstitution leaves the conduct of state elections to the states . . . and the Supreme Court has recognized that the [s]tates have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised. . . . Because the states traditionally have authority over their own elections and because the [c]onstitution contemplates that authority, courts have long recognized that not every state election dispute implicates federal constitutional rights. . . . Only in extraordinary circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation." (Citations omitted; internal quotation marks omitted.) *Shannon* v. *Jacobowitz*, supra, 394 F.3d 93–94.

In *Shannon*, the Second Circuit emphasized that, in *Daniels* v. *Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986), the United States Supreme Court "clearly articulated that a finding of intentional conduct was a prerequisite for a due process claim. . . . Although *Daniels* was not a voting case, this [c]ourt's own cases support the application of the *Daniels* holding to the election context. In *Powell* v. *Power*, [supra, 436 F.2d 85–86], six voters in a Congressional primary sought a federal remedy for errors committed by state election officials in permitting a number of individuals to cast ballots who under state law were not qualified to vote. The plaintiffs brought suit under

42 U.S.C. § 1983, invoking, inter alia, the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment. The [c]ourt found that 'the due process clause and [article I, § 2, offer] no guarantee against errors in the administration of an election.' " *Shannon* v. *Jacobowitz*, supra, 394 F.3d 94. The Second Circuit observed that subsequent case law had reaffirmed the "intentional conduct requirement of *Powell* and *Daniels*," and that, in voting cases, "plaintiffs must prove an intentional act in order to show a due process violation." Id., 95–96.

Significantly, the court further emphasized that, in "general, garden variety election irregularities do not violate the [d]ue [p]rocess [c]lause, even if they control the outcome of the vote or election. . . . Examples of such garden variety irregularities as identified by the federal courts include: malfunctioning of voting machines . . . human error resulting in miscounting of votes and delay in arrival of voting machines . . . allegedly inadequate state response to illegal cross-over voting . . . mechanical and human error in counting votes . . . technical deficiencies in printing ballots . . . mistakenly allowing non-party members to vote in a congressional primary . . . and arbitrary rejection of ten ballots . . . ."[36] (Citations omitted; internal quotation marks omitted.) Id., 96. Thus, the court concluded in *Shannon* that even an " 'outcome determinative' " malfunction of a voting machine in a local election was not a due process violation for purposes of liability under 42 U.S.C. § 1983; id., 94; because "[a]t no point have [the plaintiffs] alleged that local officials acted intentionally or in a discriminatory manner with regard to the vote miscount. Both sides concede that the recorded results were likely due to an unforeseen malfunction with [a particular] voting machine . . . . A voting machine malfunction is the paradigmatic example of a 'garden variety' election dispute." Id., 96. It described the voting machine malfunction as "differ[ing] significantly from purposeful state conduct directed at disenfranchising a class or group of citizens."[37] Id.; see also id., 97 (declining to "invite federal intervention into every negligent disruption of a local election").

It is well settled in the Second Circuit that establishing an equal protection violation requires similar proof of intentional discrimination. See *Powell* v. *Power*, supra, 436 F.2d 88 ("[u]neven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents intentional or purposeful discrimination" [internal quotation marks omitted]); see also *Rivera-Powell* v. *New York City Board of Elections*, 470 F.3d 458, 469–70 (2d Cir. 2006) (extending *Shannon* to first amendment violations premised on "allegedly unauthorized *application* of an admittedly valid restriction" because "a contrary holding would permit any plaintiff to obtain federal court review of even the most mundane election dispute merely by add-

ing a [f]irst [a]mendment claim to his or her due process claim" [emphasis in original]). Indeed, the Second Circuit subsequently held that " 'fundamental unfairness' alone, in the absence of intentional state conduct," is not sufficient to establish a constitutional violation. *Hoblock* v. *Albany County Board of Elections*, 422 F.3d 77, 97–98 (2d Cir. 2005). As the court stated in *Powell*, "we cannot believe that the framers of our [c]onstitution were so hypersensitive to ordinary human frailties as to lay down an unrealistic requirement that elections be free of any error." *Powell* v. *Power*, supra, 88.

In the operative complaint in the present case does not allege any intentional misconduct on the part of the officials charged with conducting the election for the 120th assembly district. Rather, in the allegations incorporated into the plaintiff's constitutional claims, he pleads that, "[d]uring the election on November 6, 2018, *an irregularity* developed during the day at the Bunnell High School polling location," namely, that, "[a]round midday, a packet of ballots for the 122nd assembly district was *mistakenly used* in the 120th assembly district voting line." (Emphasis added.) He further states that, "[a]s a result of this *mistake*, voters who were eligible to vote for state representative for the 120th assembly district were unable to do so, instead potentially casting votes in the wrong district." (Emphasis added.) The plaintiff then alleges that the moderator took corrective action and "noted the incident in his log as required" after "a voter detected the *mistake*." (Emphasis added.) Nowhere does the plaintiff allege any intentional acts on the part of the election officials, describing the ballot mix-up only as "irregularities." Thus, the plaintiff has pleaded only a "garden variety election dispute" akin to the malfunctioning voting machine in *Shannon*, rather than the intentional conduct sufficient to state a constitutional claim under Second Circuit case law.[38] See *Hill* v. *Gunn*, 367 F. Supp. 2d 532, 534–35 (S.D.N.Y. 2005) (concluding that plaintiff did not state violation of right to vote under federal due process clause when she pleaded election workers "knew or should have known that because plaintiff's polling machine malfunctioned, she was unable to cast her vote and they therefore should have given her an additional opportunity to recast her vote," and that their refusal to permit her to recast vote was not act sufficiently intended to deprive her of constitutional right). We, therefore, conclude that the plaintiff has not made a colorable claim of a constitutional violation because he has alleged only that local elections officials made an unintentional mistake, rather than adopted an intentional practice or policy.[39] Accordingly, even if our state courts would have jurisdiction over such a federal constitutional claim, the plaintiff has not sufficiently pleaded such a claim in the present case, and we uphold its dismissal by the trial court. See footnote 35 of this opinion.

## II

### THE DEFENDANTS' APPEALS FROM THE
### GRANT OF INJUNCTIVE RELIEF

We next turn to the defendants' appeals in which they claim that the trial court improperly granted the plaintiff's motion for a temporary injunction prohibiting the state officials from declaring a winner pursuant to § 9-319. The plaintiff disagrees, and also contends that the defendants' appeals have been rendered moot because of the passage of the statutory deadline in § 9-319, which requires that the "votes from the election be canvassed and a winner declared 'during the month in which they are cast,' " namely, November, 2018.

### A

### Mootness

Because it implicates this court's appellate subject matter jurisdiction, we begin with the plaintiff's mootness claim. The plaintiff contends that the defendants' appeals challenging the trial court's order of injunctive relief have been rendered moot because of the passage of the statutory deadline in § 9-319. The plaintiff posits that the "only way that there can be compliance with . . . § 9-319 is with a new, complete, and constitutional election, where the votes are canvassed and the winner declared in the same month in which they are cast, after all eligible voters have had the opportunity to participate." The plaintiff contends that the defendants "cannot get practical relief through their appeals," in which they seek reversal of the injunction, because even if this court reverses that order, "§ 9-319 remains unchallenged and in effect and, therefore, votes from the constitutionally infirm November 6, 2018 election now cannot be canvassed." The plaintiff relies on *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 858 A.2d 709 (2004), which had deemed significant the fact that an appeal was heard and decided before the impeachment committee's deadline, and argues that the defendants' appeals are moot because of the passage of the November 30 deadline. In response, the state defendants contend that practical relief remains available because, independent of § 9-319, article third, § 7, of the Connecticut constitution gives them a mandatory duty to canvass and declare. The state defendants also contend that the plaintiff does not cite any legal authority for the proposition that noncompliance with the statutory deadline actually precludes them from performing their election duties. We agree with the defendants, and conclude that their appeals are not moot.

"It is well established that [m]ootness implicates [this] court's subject matter jurisdiction and is thus a threshold matter for us to resolve. . . . It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdic-

tion; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . An actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot." (Internal quotation marks omitted.) *In re Emma F.*, 315 Conn. 414, 423–24, 107 A.3d 947 (2015); see also, e.g., *Statewide Grievance Committee* v. *Burton*, 282 Conn. 1, 13, 917 A.2d 966 (2007) ("the central question in a mootness problem is whether a change in the circumstances that prevailed at the beginning of the litigation has forestalled the prospect for meaningful, practical, or effective relief").

Appeals challenging temporary injunctions may be rendered moot by, inter alia, the cessation of the challenged activity or the expiration of the injunction by its own terms. See, e.g., *Connecticut State Employees Assn.* v. *American Federation of State, County & Municipal Employees, AFL-CIO*, 188 Conn. 196, 199–200, 448 A.2d 1341 (1982). Whether an appeal from an injunction is, however, rendered moot by the passage of a statutory deadline for the enjoined action is a question of first impression for this court.[40] On this point, we find instructive the decision of the District of Columbia Circuit in *Jacksonville Port Authority* v. *Adams*, 556 F.2d 52 (D.C. Cir. 1977). In *Jacksonville Port Authority*, the court concluded that an appeal from a denial of a temporary restraining order was not moot because a port authority could vindicate its right to a grant from the Federal Aviation Administration, despite the passage during the pendency of the litigation of a statutory deadline for the initiation of such grants, because a "congressional deadline on an agency's ability to take action on its own motion does not preclude an agency's authority to take later action on direction of a court exercising judicial review." Id., 56–57. The court emphasized that "equitable considerations prevent an agency from raising a statutory prohibition on it—in reality, [as] a command to meet a deadline—as a defense to a suit brought prior to that deadline for money withheld by the agency's arrogation of unauthorized discretion." Id., 55; see id. (observing that statutory deadline was intended "to avoid procrastination and the dangers of an agency discretion to dip into old unused authorizations"). The court emphasized that the port authority had "made timely application and brought suit within the time the agency is authorized to act, seeking judicial determination and vindication of its entitlement to the funds." Id., 56. The court determined that, "in the interest of justice, the court may proceed as if action that should have been taken in the courthouse was timely taken," and that "it is a well-established prerogative of

the [c]ourt to treat as done that which should have been done." (Internal quotation marks omitted.) Id.; see also *Recording Industry Assn.* v. *Copyright Royalty Tribunal*, 662 F.2d 1, 18 n.40 (D.C. Cir. 1981) ("[t]he statutory provision requiring the [defendant] to render its final decision within one year from initiation of proceedings . . . does not preclude further proceedings on direction of a court exercising judicial review" [citation omitted]); accord *Sierra Pacific Industries* v. *Lyng*, 866 F.2d 1099, 1111–12 (9th Cir. 1989) (when statutory deadline is not "jurisdictional," court may order equitable relief to compensate for agency's failure to act). This federal case law indicates, then, that the passage of the statutory deadline for an action that had been enjoined does not render moot an appeal from that injunction.

The District of Columbia Circuit's decision in *Jacksonville Port Authority* is consistent with Connecticut courts' authority—in the absence of statutory preclusion—to render *judgments* nunc pro tunc, or "now for then," when "necessary in furtherance of justice and in order to save a party from unjust prejudice . . . caused by the act of the court or the course of judicial procedure. In other words, the practice is intended merely to make sure that one shall not suffer for an event which he could not avoid." (Internal quotation marks omitted.) *Gary Excavating Co.* v. *North Haven*, 163 Conn. 428, 430, 311 A.2d 90 (1972). Thus, it is significant that there is nothing in § 9-319 that suggests that the appeal from the injunction was rendered moot by the passage of the November 30 deadline. That statute provides: "The votes for state senators, state representatives and judges of probate, as returned by the moderators, *shall be canvassed, during the month in which they are cast,* by the Treasurer, Secretary of the State and Comptroller, and they shall declare, except in case of a tie vote, who is elected senator in each senatorial district, representative in each assembly district and judge of probate in each probate district. The Secretary of the State shall, within three days after such declaration, give notice by mail to each person chosen state senator, state representative or judge of probate of his election." (Emphasis added.) General Statutes § 9-319. First, the statutory language setting the deadline of "during the month in which they are cast," modifies only the canvassing requirement, rather than the timing of the declaration. Second, there are no "negative words" in the statute invalidating or nullifying a canvass or declaration made after the passage of one month.[41] Cf. *Butts* v. *Bysiewicz*, 298 Conn. 665, 678–80, 5 A.3d 932 (2010) (noting that General Statutes § 9-388, which requires that certificate of party's endorsement be received by prescribed deadline, has language providing that " 'certificate shall be invalid,' " or "lack legal effect," and also states that absence of certificate means that political party "shall be deemed to have made no endorsement of any candidate for such office"). Accord-

ingly, we conclude that the defendants' appeals from the grant of the temporary injunction are not moot.

B

Merits

As to the defendants' challenge to the temporary injunction, they first contend that, because the trial court lacked jurisdiction over this case, it similarly lacked jurisdiction to consider the plaintiffs' motion for a temporary injunction, and should have dismissed the motion on that ground. The state defendants further emphasize that the trial court improperly relied on *Kinsella* v. *Jaekle*, supra, 192 Conn. 704, in support of its conclusion that it had jurisdiction over the plaintiff's motion for a temporary injunction. In response, the plaintiff reiterates his jurisdictional arguments, previously addressed in part I of this opinion, to support the trial court's exercise of its jurisdiction to order a temporary injunction. We agree with the defendants, and conclude that the trial court lacked jurisdiction to enjoin the state defendants from declaring a winner pursuant to § 9-319.[42]

"A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion . . . the trial court's decision must stand. . . . How a court balances the equities is discretionary but if, in balancing those equities, a trial court draws conclusions of law, our review is plenary." (Citation omitted; internal quotation marks omitted.) *Commissioner of Correction* v. *Coleman*, 303 Conn. 800, 810, 38 A.3d 84 (2012), cert. denied, 568 U.S. 1235, 133 S. Ct. 1593, 185 L. Ed. 2d 589 (2013); see also, e.g., *Aqleh* v. *Cadlerock Joint Venture II, L.P.*, 299 Conn. 84, 97–98, 10 A.3d 498 (2010) (standard for granting temporary injunction).

If the trial court lacks subject matter jurisdiction over a case, it similarly lacks jurisdiction to render even a temporary injunction. See *Olcott* v. *Pendleton*, 128 Conn. 292, 295–96, 22 A.2d 633 (1941) (emphasizing difference between jurisdiction and merits with respect to temporary injunctions); cf. *Park City Hospital* v. *Commission on Hospitals & Health Care*, 210 Conn. 697, 701–702, 556 A.2d 602 (1989) (given that trial court had equitable jurisdiction pursuant to General Statutes § 52-1, it did not need to consider aggrievement for purposes of administrative appeal before granting application for stay and restraining order); *Holley* v. *McDonald*, 154 Conn. 228, 233, 224 A.2d 727 (1966) (distinguishing "an erroneous exercise of the court's equitable jurisdiction" from "an action beyond that equitable jurisdiction"). Given our conclusion that the trial court lacked jurisdiction over the plaintiff's claims in

the present case; see part I of this opinion; we conclude that it similarly lacked jurisdiction to enjoin the state defendants from canvassing the votes and declaring a winner, even temporarily. Accordingly, the temporary injunction must be vacated.[43] See footnote 7 of this opinion.

The judgment is reversed insofar as it denied Young's motion to dismiss in part and granted the plaintiff's application for a temporary injunction, and the case is remanded with direction to grant Young's motion to dismiss in its entirety; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

* January 30, 2019, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The amended complaint also named the following local election officials for the town as defendants: Rick Marcone, the town's Democratic registrar of voters; Lou Decilio, the town's Republican registrar of voters; Beth Boda, the head moderator for the election; John Krekoska, the head moderator of the recount; and Susan M. Pawluk, the town's clerk. Although these local election officials have appeared through counsel both before the trial court and in these appeals, they have not otherwise participated in this case. For the sake of simplicity, we refer to Young, Merrill, Nappier, and Lembo, collectively, as the defendants, and to Young, individually, by name.

[2] Article third, § 7, of the Connecticut constitution provides in relevant part: "The treasurer, secretary of the state, and comptroller shall canvass publicly the votes for senators and representatives. The person . . . in each assembly district having the greatest number of votes for representative shall be declared to be duly elected for such district. . . . The return of votes, and the result of the canvass, shall be submitted to the house of representatives and to the senate on the first day of the session of the general assembly. Each house shall be the final judge of the election returns and qualifications of its own members."

[3] Although an order granting a temporary injunction is ordinarily not an immediately appealable final judgment; see, e.g., *Bozrah* v. *Chmurynski*, 303 Conn. 676, 681–82, 36 A.3d 210 (2012); we have appellate jurisdiction because § 52-265a "permits this court to consider an interlocutory appeal from the trial court." *State* v. *Komisarjevsky*, 302 Conn. 162, 165, 25 A.3d 613 (2011); see also footnote 7 of this opinion.

[4] General Statutes § 9-328 provides in relevant part: "Any elector or candidate claiming to have been aggrieved by any ruling of any election official in connection with an election for any municipal office or a primary for justice of the peace, or any elector or candidate claiming that there has been a mistake in the count of votes cast for any such office at such election or primary, or any candidate in such an election or primary claiming that he is aggrieved by a violation of any provision of sections 9-355, 9-357 to 9-361, inclusive, 9-364, 9-364a or 9-365 in the casting of absentee ballots at such election or primary, may bring a complaint to any judge of the Superior Court for relief therefrom. . . . Such judge shall, on the day fixed for such hearing and without unnecessary delay, proceed to hear the parties. If sufficient reason is shown, he may order any voting tabulators to be unlocked or any ballot boxes to be opened and a recount of the votes cast, including absentee ballots, to be made. Such judge shall thereupon, if he finds any error in the rulings of the election official or any mistake in the count of the votes, certify the result of his finding or decision to the Secretary of the State before the tenth day succeeding the conclusion of the hearing. Such judge may order a new election or primary or a change in the existing election schedule. Such certificate of such judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such election officials, to the correctness of such count, and, for the purposes of this section only, such claimed violations, and shall operate to correct the returns of the moderators or presiding officers, so as to conform to such finding or decision, except that this section shall not affect the right of appeal to the Supreme Court and it shall not prevent such judge from reserving such questions of law for the advice of the Supreme Court as provided in section 9-325. Such judge may, if necessary, issue his writ

of mandamus, requiring the adverse party and those under him to deliver to the complainant the appurtenances of such office, and shall cause his finding and decree to be entered on the records of the Superior Court in the proper judicial district."

[5] The supremacy clause of the United States constitution provides in relevant part: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

[6] The complaint alleges that the voter checklist at Bunnell High School for the 120th assembly district shows 1575 names crossed off the official checklist, but only 1499 ballots processed, which would indicate 76 fewer ballots than voters. In contrast, the checklist at that location for the 122nd assembly district allegedly shows 952 names crossed off the official checklist, but 1031 ballots processed, which would indicate 79 more ballots than voters.

We note that the checklist summary for the 122nd assembly district, which was supplied as an exhibit in the appendix to the plaintiff's brief, indicates that the names of 954 voters had been crossed off. This would result in an actual difference of 77 more ballots than voters. This minor typographical discrepancy does not, however, affect the substantive analysis within this opinion.

[7] Although the plaintiff styled his application as one for "an emergency temporary restraining order," we, like the parties and the trial court, refer in this opinion to that application as one for a "temporary injunction" because it was granted after notice and a hearing. See, e.g., *Canterbury* v. *Kukevitch*, Superior Court, judicial district of Windham, Docket No. CV-03-0070337-S (June 17, 2003) (35 Conn. L. Rptr. 14, 16) ("[u]nder Connecticut law, the phrase temporary injunction refers both to what the somewhat more highly articulated federal courts would call a temporary restraining order [i.e., one issued without notice to the adverse party] and to what they would call a preliminary injunction [i.e., one issued after notice and hearing]" [internal quotation marks omitted]).

[8] The plaintiff filed the amended complaint while a motion to dismiss, filed by Young with the support of the state defendants, was pending with respect to the original complaint.

[9] On December 13, 2018, the trial court issued a written memorandum of decision further articulating its oral decision on the parties' motions.

[10] General Statutes § 9-319 provides: "The votes for state senators, state representatives and judges of probate, as returned by the moderators, shall be canvassed, during the month in which they are cast, by the Treasurer, Secretary of the State and Comptroller, and they shall declare, except in case of a tie vote, who is elected senator in each senatorial district, representative in each assembly district and judge of probate in each probate district. The Secretary of the State shall, within three days after such declaration, give notice by mail to each person chosen state senator, state representative or judge of probate of his election."

[11] We reiterate our gratitude to counsel, first voiced by Justice McDonald at oral argument before this court, for their thorough and professional briefing and argument of this case on an expedited basis.

We also note that, in the afternoon of December 20, 2018, the day before oral argument in these appeals, the ACLU Foundation of Connecticut filed an application for permission to file an amicus curiae brief. Although we ordinarily are very receptive to amicus briefs, we denied this application because its eve of argument timing would have rendered the filing of such a brief in the present appeals both potentially prejudicial to the parties and comparatively less useful to the court.

[12] The use of the word "returns" to modify "election" renders that phrase suggestive of the vote tally, rather than the electoral process that produces the votes. See *Henry* v. *Henderson*, 697 So. 2d 447, 451 (Miss. 1997) ("The [c]onstitution gives authority to each house to judge the return and election of its own members. Return and election includes the proper number of votes cast for each candidate."), overruled on other grounds by *Dillon* v. *Myers*, 227 So. 3d 923 (Miss. 2017); accord *State ex rel. Morris* v. *Bulkeley*, supra, 61 Conn. 363 ("When a command has been issued from some superior authority to an officer, the 'return' is the official statement by the officer of what he has done in obedience to the command or why he has done nothing. Whatever thing the superior authority may require the officer to do, of the doing of that thing it may require him to make return. The return

made by the presiding officer of an electors' meeting is his official statement of what was done at that meeting.").

[13] Indeed, it is significant that, "[p]rior to the adoption of the constitution of this state in 1818, all governmental power, including the judicial power, was vested in the General Assembly." *State* v. *Clemente*, 166 Conn. 501, 512, 353 A.2d 723 (1974); see also W. Horton, supra, pp. 99–100 (discussing *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 37 A. 1080 [1897], as standing for proposition that constitution is grant of power to three branches, rather than reservation of remaining powers to General Assembly as held in *Starr* v. *Pease*, 8 Conn. 541 [1831]).

[14] The constitution of the United States, article one, § 5, provides in relevant part: "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members . . . ."

[15] The constitution of the United States, article one, § 4, provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

[16] See *Baker* v. *Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).

[17] We note that the plaintiff attempts to distinguish *Morgan* v. *United States*, supra, 801 F.2d 445, on the ground that the congressional determination preceded the civil action in that case, whereas the opposite timing is true in this case, as our state House of Representatives has not yet acted. In our view, this timing is a distinction without a difference, because the potential for judicial encroachment on the legislative prerogative is the same, given the troubling specter of the legislature's having to reject a judicial determination of the same issue. Indeed, *Morgan* itself suggested that the timing was irrelevant when the court concluded that its interpretation of the federal elections clause was "plainly endorse[d]" by the Supreme Court's decision in *Roudebush* v. *Hartke*, supra, 405 U.S. 15, because the Supreme Court, in considering whether the Senate's decision to seat a candidate had rendered the case moot, stated that it had jurisdiction to consider the broader legal question of whether a state's recount scheme violated the elections clause, rather than to decide the specific underlying dispute, as " 'which candidate is entitled to be seated in the Senate is, to be sure, a nonjusticiable political question—*a question that would not have been the business of this* [c]*ourt even before the Senate acted.*' " (Emphasis altered.) *Morgan* v. *United States*, supra, 448–49, quoting *Roudebush* v. *Hartke*, supra, 19.

[18] A comprehensive collection of generally early cases on this point is set forth in an annotation published within the American Law Reports. See generally annot., 107 A.L.R. 205 (1937 and Cum. Supp. 2011).

[19] We note that the Kentucky Supreme Court's decision in *Stephenson* v. *Woodward*, supra, 182 S.W.3d 162, allowing the court to continue to consider the qualifications of a legislator, even after the election, has been heavily criticized as "extraordinary reasoning, which defies [long-standing] tradition and precedent, [and as] inconsistent with legislative independence, which the [Kentucky Supreme] Court itself has recognized as a critical facet of separation of powers." (Footnotes omitted.) P. Salamanca & J. Keller, "The Legislative Privilege To Judge the Qualifications, Elections, and Returns of Members," 95 Ky. L.J. 241, 244 (2007); see also id., 366 (concluding that court's "most salient conclusion . . . simply cannot withstand scrutiny" because legislature "lacked power to delegate the [state] senate's authority under the [Kentucky] constitution irrevocably to the courts").

[20] We acknowledge that, in *In re Application of Mylchreest*, supra, 6 Conn. Supp. 436, the Superior Court, in rejecting the applicant's request for a court-ordered recount of ballots in a disputed state Senate race, observed that, under the elections clause of the Connecticut constitution, "it is justifiable for the [l]egislature to make provision for a judge of the Superior Court to pass upon the question as to who has been elected governor or to some other state office *but not proper* for any court to be given power to pass upon the question as to who has been elected state senator or representative." (Emphasis added.) Given the fact that no statute authorizes court action in this case; see also part I B of this opinion; we need not consider whether the Superior Court properly suggested in *In re Application of Mylchreest* that a statute authorizing a court-ordered recount in a legislative race would be unconstitutional under the elections clause. See id. ("[t]he difference between the constitutional powers of the General Assembly with reference to the election of state officers and its power with reference to the election of its own members is that as to the former the [Connecticut] [c]onstitution

nowhere provides that the General Assembly shall be the 'final' judges").

[21] We also disagree with the plaintiff's reliance on *State ex rel. Wahl* v. *Richards*, supra, 44 Del. 566, *Akizaki* v. *Fong*, 51 Haw. 354, 461 P.2d 221 (1969), and *McGann* v. *Board of Elections*, supra, 85 R.I. 223, in support of his position that Connecticut courts have jurisdiction to afford him relief because these cases are all factually and legally distinguishable from the present case. In *State ex rel. Wahl* v. *Richards*, supra, 573, the Delaware Supreme Court held that it had jurisdiction to issue a writ of mandamus to the Delaware Superior Court, sitting as the Board of Canvass, to recanvass the vote in an election for the office of state representative in accordance with a state statute governing vote counting procedures. In the present case, the plaintiff does not claim that the defendants violated any clear state statute governing election procedures. In addition, the Delaware Supreme Court in *Richards* had authority under a state constitutional provision to issue writs of mandamus to the Superior Court. See id., 572.

In *Akizaki* v. *Fong*, supra, 51 Haw. 356–57, the court was required to resolve a conflict between a state constitutional provision analogous to our elections clause and another constitutional provision providing that "[c]ontested elections shall be determined by a court of competent jurisdiction . . . ." The court resolved this conflict by holding that the state house of representatives' "function in judging the elections of its members extends only to ascertaining whether the [state] [c]onstitution has been complied with; that is, whether the parties have properly invoked the jurisdiction of a competent court to judge the contest . . . ." Id., 358. The Hawaii Supreme Court's decision in *Akizaki* is of no persuasive value because the Connecticut constitution contains no provision specifically authorizing courts of this state to determine election contests. See *Wheatley* v. *Secretary of Commonwealth*, supra, 439 Mass. 855 n.10.

In *McGann* v. *Board of Elections*, supra, 85 R.I. 237, the issue before the court was the constitutionality of a state statute authorizing civilian absentee and shut-in electors to vote before election day. The court concluded that, notwithstanding a state constitutional provision authorizing each house to be the judge of the elections of its own members, the court had exclusive jurisdiction to decide "questions of constitutional and fundamental law . . . ." Id., 230. In the present case, however, the plaintiff is not challenging the constitutionality of any state statute, and merely mounts a narrower challenge to the administration of a single legislative election.

[22] After *Bakken*, North Dakota subsequently amended its state constitution to make even clearer the role of the judiciary in deciding elections contests, including those in legislative elections. See *Timm* v. *Schoenwald*, 400 N.W.2d 260, 264 (N.D. 1987) (discussing applicability of post-*Bakken* state constitutional amendment specifically providing that " '[e]ach house is the judge of the qualifications of its members, *but election contests are subject to judicial review as provided by law*' " [emphasis in original]). This amendment to North Dakota's constitution, and a similar provision in Hawaii; see *Akizaki* v. *Fong*, 51 Haw. 354, 356–57, 461 P.2d 221 (1969); have been described as inconsistent with concepts of legislative independence and legislative privilege, particularly given that the power to remove is the power of control. See P. Salamanca & J. Keller, "The Legislative Privilege To Judge the Qualifications, Elections, and Returns of Members," 95 Ky. L.J. 241, 255 (2007).

[23] With respect to the separation of powers, we note that the District of Columbia Circuit Court of Appeals emphasized in *Morgan* that the exclusivity of legislative jurisdiction "makes eminent practical sense. The pressing legislative demands of contemporary government have if anything increased the need for quick, decisive resolution of election controversies. Adding a layer of judicial review, which would undoubtedly be resorted to on a regular basis, would frustrate this end. What is involved, it should be borne in mind, is not judicial resolution of a narrow issue of law, but review of an election recount, with all the fact-finding that that entails. If it be said that the relevant [h]ouse is not the appropriate body to make the determination because of the possibility of improper political motivation, the response is that '[a]ll power may be abused if placed in unworthy hands. But it would be difficult . . . to point out any other hands in which this power would be more safe, and at the same time equally effectual.' *Luther* v. *Borden*, 48 U.S. (7 How.) 1, 44, 12 L. Ed. 581 (1849)." *Morgan* v. *United States*, supra, 801 F.2d 450; see also P. Salamanca & J. Keller, "The Legislative Privilege To Judge the Qualifications, Elections, and Returns of Members," 95 Ky. L.J. 241, 361 (2007) ("[a]llowing the courts to sit in judgment on the qualifications, elections, and returns of members, particularly where the [c]onstitution explicitly vests this authority in the legislature, undermines not only text

but also legislative independence and separation of powers”).

[24] We note that we do not understand the plaintiff to argue that the courts and the legislature share jurisdiction over legislative election contests challenging the administration of the election. Such complementary jurisdiction, which would render the ultimate judicial determination advisory, has been criticized as problematic given the constitutional complications attendant to the issuance of advisory opinions, along with an even greater potential for interbranch entanglement. See *Scheibel* v. *Pavlak*, supra, 282 N.W.2d 849–50; *McIntyre* v. *Wick*, supra, 558 N.W.2d 367–68 (Sabers, J., dissenting). One commentator has described complementary legislative and judicial jurisdiction as a “fundamentally flawed” concept insofar as “[t]his sort of judicial pressure or interference, however innocently couched by the court, is exceedingly difficult to justify in light of the constitution’s exclusive commitment of the power to judge state legislative elections to the [l]egislative [d]epartment.” R. Parsons, “Pierre Pressure: Legislative Elections, the State Constitution, and the Supreme Court of South Dakota,” 50 S.D. L. Rev. 218, 234–35 (2005).

[25] We note that General Statutes § 9-215, which governs the filling of legislative vacancies, by its own terms, applies only in the event of a member’s death or resignation. See General Statutes § 9-215 (a) (“When *any member or member-elect of the General Assembly resigns*, the member or member-elect shall resign by notifying the Secretary of the State of the member’s or member-elect’s decision, and if *any member or member-elect of the General Assembly dies*, the town clerk from the town in which the member or member-elect resides shall notify the Secretary of the State of such death” [emphasis added]).

[26] The plaintiff expresses his concern about the impact of partisanship on the legislature’s ability to resolve election disputes fairly. With respect to partisanship, we agree with the District of Columbia Circuit’s dismissal of concerns about “party-line votes” in election cases by emphasizing that the point that “institutional incentives make it safer to lodge the function [in the legislature] than anywhere else still stands. The major evil of interference by other branches of government is entirely avoided, while a substantial degree of responsibility is still provided by regular elections, the interim demands of public opinion, and the desire of each [h]ouse to preserve its standing in relation to the other institutions of government.” *Morgan* v. *United States*, supra, 801 F.2d 450.

[27] We emphasize that, although the elections clause requires us to stay our hand, we do not foreclose a limited role for the courts in cases arising from legislative election disputes. It is “conceivable, for example, that in investigating such a dispute a [legislative body] might go beyond its constitutional power to compel witnesses. In that event, a clear showing of such arbitrary and improvident use of the power as will constitute a denial of due process of law would justify limited judicial interference. . . . Such a due process violation, however, must rest on violation of some individual interest beyond the failure to seat an individual or to recognize that person as the winner of an election. That substantive determination, which is the issue in the present case, resides entirely with the [h]ouse.” (Citation omitted; internal quotation marks omitted.) *Morgan* v. *United States*, supra, 802 F.2d 451; see also *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 575, 858 A.2d 709 (2004) (“It is true that underlying this matter was a discretionary decision by the defendant to issue the subpoena to the governor. Our consideration of whether that decision comports with constitutional principles, however, does not require us to evaluate the wisdom of that decision, but only whether that decision exceeded constitutional limitations.”); *Kinsella* v. *Jaekle*, supra, 192 Conn. 726 (“[b]ecause the committee is acting within its jurisdiction, the Superior Court may exercise jurisdiction in this impeachment controversy only if the plaintiff alleges that egregious and otherwise irreparable violations of constitutional guarantees are being or have been committed”).

[28] General Statutes § 9-372 (7) provides: “ ‘Municipal office’ means an elective office for which only the electors of a single town, city, borough, or political subdivision, as defined in subdivision (10) of this section, may vote, including the office of justice of the peace . . . .”

[29] Specifically, Young argues that the plaintiff’s construction would mean that “the election of 73 of the 151 [state representatives] would be subject to judicial review under § 9-328, and 78 would not. . . . None of the 36 state senators’ elections would be subject to § 9-328. There is no articulable reason . . . why the General Assembly would have chosen to allow by statute judicial challenges to fewer than one half of house seats but not the

others." (Citations omitted; emphasis omitted.)

[30] " 'Political subdivision' means any voting district or combination of voting districts constituting a part of a municipality." General Statutes § 9-372 (10).

[31] As the defendants argue, we note that, in an unpublished decision arising from a challenge to the election of then-Representative Joan Hartley, the Superior Court adopted this construction of §§ 9-328 and 9-372 (7) more than three decades ago. See *Bogen* v. *Hartley*, Superior Court, judicial district of Waterbury, Docket No. 070798 (November 21, 1984).

[32] See General Statutes § 9-323 (election of presidential electors, United States senator, and United States representative); General Statutes § 9-324 (election of probate judges and governor, lieutenant governor, secretary of the state, treasurer, attorney general, and comptroller); see also General Statutes § 9-329a (primary elections).

[33] Young also cites the remarks during a 1985 debate in our state House of Representatives concerning the challenge of the election of then-Representative Joan Hartley as evincing the legislature's understanding that § 9-328 is inapplicable because it, and other election contest statutes, did not apply to state legislative elections, thus rendering legislative proceedings under the elections clause the exclusive remedy. Although undoubtedly interesting from a historical perspective, this debate is of minimal persuasive value with respect to the interpretation of § 9-328 because it is not a contemporaneous statement of legislative intent. See, e.g., *State* v. *Nixon*, 231 Conn. 545, 560, 651 A.2d 1264 (1995) ("[a]lthough we have on occasion and under particularly compelling circumstances inferred earlier legislative intent from the legislative history of a subsequent legislature . . . the views of a subsequent [legislature] form a hazardous basis for inferring the intent of an earlier one" [citation omitted; internal quotation marks omitted]). In any event, because we conclude that the statutory scheme at issue in the present case is plain and unambiguous on this point, § 1-2z precludes our consideration of this proffered extratextual evidence.

[34] We acknowledge the plaintiff's contention that the parties have consistently treated the election as one for a municipal office. Specifically, he represents that the town "had six [state legislative] offices up for election in 2018." Three of those offices were for assembly districts that crossed town boundaries, and three were for districts that were located entirely within the town. For the multitown districts, the major political parties followed the nomination procedures for district offices set forth in General Statutes § 9-382, which requires them to call a "state or district convention." For the districts that were entirely within the town, the parties followed the nomination procedures for "municipal offices" set forth in General Statutes § 9-390 (a), which, in the absence of a direct primary, requires the parties to endorse their candidates via a party caucus or town committee. Even if we assume the correctness of the nominating procedures followed by the parties, the legislature's decision to provide different *nominating* procedures for the office of state representative, depending on whether the assembly district was contained entirely within one town or crossed town boundaries, which reasons the plaintiff does not address, does not mean that those same reasons would justify treating subsequent *election contests* involving state representatives differently on the basis of the same distinction. This is particularly so given the strictly enumerated applicability of the definitions contained in § 9-372, which extend to chapter 153 of the General Statutes, a statutory scheme governing the unique concerns attendant to the nomination of candidates by political parties, rather than the administration of a general election.

[35] Although subject matter jurisdiction is a threshold issue that we must address before proceeding to the merits, we may make legal assumptions with respect to jurisdiction in appropriate cases. See *Sousa* v. *Sousa*, 322 Conn. 757, 779–80, 143 A.3d 578 (2016) (assuming without deciding that "restriction of postjudgment modification of property distributions in [General Statutes] § 46b-86 [a] is in fact jurisdictional in nature" for purposes of determining whether judgment was subject to collateral attack for lack of jurisdiction). Given that we "do not engage in addressing constitutional questions unless their resolution is unavoidable"; *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002); we address the defendants' relatively simple pleading argument first, rather than the more complicated constitutional issue with respect to the availability of state law jurisdictional defenses under the federal supremacy clause, under this court's decisions in *Sullins* and *Fetterman*, and the United States Supreme Court's decisions on which the defendants rely, namely, *Haywood* v. *Drown*, 556 U.S. 729, 129 S. Ct.

2108, 173 L. Ed. 2d 920 (2009), and *Howlett* v. *Rose*, 496 U.S. 356, 110 S. Ct. 2430, 110 L. Ed. 2d 332 (1990).

In addressing the pleading arguments first, we agree with Young's acknowledgment that the failure of the complaint to adequately raise a federal constitutional violation is "not necessarily central to the question of whether the [trial court] had jurisdiction over the federal claims . . . ." Given that the parties have briefed this issue, which presents a question of law on the pleadings in this case, we address it first, even though the sufficiency of a pleading, namely, whether the allegations therein state a claim, is addressed via a motion to strike, rather than a motion to dismiss, which challenges a court's jurisdiction. See, e.g., *Santorso* v. *Bristol Hospital*, 308 Conn. 338, 349–50, 63 A.3d 940 (2013); see also id., 353–54 (concluding that res judicata did not apply when "the first action was not disposed of on its merits, notwithstanding the court's granting of the defendants' motions to strike, when the motions granted should have been treated as motions to dismiss"). This is because, given the posture of this case, any potential impropriety in the dismissal of the plaintiff's constitutional claims is rendered harmless by the fact that they are properly subject to a motion to strike, given the lack of any evidence to support a claim of an intentional deprivation of rights. See *Fort Trumbull Conservancy, LLC* v. *Alves*, 262 Conn. 480, 501–502, 815 A.2d 1188 (2003) (procedurally improper granting of motion to dismiss instead of motion to strike is harmless error when there is nothing in record to suggest that plaintiff could amend complaint to state viable claim); *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 528, 590 A.2d 438 (1991) (same); *Davis* v. *Davis-Henriques*, 163 Conn. App. 301, 313, 135 A.3d 1247 (2016) (The Appellate Court affirmed a judgment of dismissal in a probate appeal from a denial of a collateral attack on a probate decree because the complaint did "not set forth a colorable claim that the . . . decree was procured by fraud, mistake, or like equitable ground. As a result, the plaintiff's complaint is legally insufficient, and there is nothing in the record to suggest that the plaintiff could amend his complaint to allege a viable claim for relief under [General Statutes] § 45a-24."); *Mercer* v. *Rodriquez*, 83 Conn. App. 251, 267–68, 849 A.2d 886 (2004) (affirming judgment dismissing complaint because, although trial court improperly determined that prisoner's failure to exhaust available administrative remedies as required by federal Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e [a], was subject matter jurisdictional, failure to plead exhaustion nevertheless rendered complaint subject to motion to strike); see also *Gold* v. *Rowland*, 296 Conn. 186, 205 n.18, 994 A.2d 106 (2010) (noting that plaintiff failed to identify evidence that would cure deficiencies in complaint, and concluding that "[w]hen a complaint properly would have been subject to a motion to strike and the plaintiff cannot cure the deficiencies in the complaint, we properly may reverse the trial court's denial of a motion to dismiss rather than remand the case to the trial court so that the defendant may file a motion to strike that the trial court would be required to grant").

[36] The Second Circuit further noted that, "[w]ithout question, courts have found due process violations in voting cases before, but each case involved an intentional act on the part of the government or its officials. . . . Infringements of voting rights that have risen to the level of constitutional violation include: dilution of votes by reason of malapportioned voting districts or weighted voting systems . . . purposeful or systematic discrimination against voters of a certain class . . . geographic area . . . or political affiliation . . . and other [wilful] conduct that undermines the organic processes by which candidates are elected . . . . Each required intentional state conduct directed at impairing a citizen's right to vote." (Citations omitted.) *Shannon* v. *Jacobowitz*, supra, 394 F.3d 96; see also footnote 38 of this opinion.

[37] The Second Circuit has observed that it is not alone in requiring proof of intent, citing *Rossello-Gonzalez* v. *Calderon-Serra*, 398 F.3d 1, 14 (1st Cir. 2004), *Siegel* v. *LePore*, 234 F.3d 1163, 1181 (11th Cir. 2000), *Bennett* v. *Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998), cert. denied sub nom. *Citizens for a Constitutional Convention* v. *Yoshina*, 525 U.S. 1103, 119 S. Ct. 868, 142 L. Ed. 2d 770 (1999), and *Hutchinson* v. *Miller*, 797 F.2d 1279, 1283 (4th Cir. 1986), cert. denied, 479 U.S. 1088, 107 S. Ct. 1295, 94 L. Ed. 2d 151 (1987). *Rivera-Powell* v. *New York City Board of Elections*, 470 F.3d 458, 469 n.16 (2d Cir. 2006).

[38] A review of federal case law provides various examples of purposeful misconduct generally found sufficient to state such a constitutional claim. See *Acosta* v. *Democratic City Committee*, 288 F. Supp. 3d 597, 646–47

(E.D. Pa. 2018) (allegations of poll workers threatening and intimidating voters, and distributing literature and encouraging voters to choose particular candidate, were sufficient evidence of intent if attributable to state actors named as defendants); *Westchester County Independence Party* v. *Astorino*, 137 F. Supp. 3d 586, 622 (S.D.N.Y. 2015) (concluding that election officials' decision to accept improper or late absentee ballot applications was sufficiently intentional to defeat summary judgment motion, and proceeding to next step, whether "fair and adequate state remedy exists"); *Willingham* v. *Albany*, 593 F. Supp. 2d 446, 459–60 (N.D.N.Y. 2006) (denying motion for summary judgment on equal protection claim arising from absentee ballot abuses during primary by party leader and campaign manager who worked at public housing complex where abuses took place, including "[o]btaining absentee ballot applications, soliciting voters to complete those applications, asserting false reasons on the applications, delivering the applications to the [board of elections], and receiving back the ballots for the voters").

[39] In support of his claim to the contrary, the plaintiff relies on *Hunter* v. *Hamilton County Board of Elections*, 635 F.3d 219, 234–35 n.13 (6th Cir. 2011), in which the United States Court of Appeals for the Sixth Circuit held that, in the context of elections, there can be an equal protection violation even in the absence of evidence of intentional discrimination. See id., 235 n.13 (rejecting defendant's "argument that there can be no violation of the [e]qual [p]rotection [c]lause . . . without evidence of intentional discrimination"). In support of this conclusion, the court in *Hunter* relied on the United States Supreme Court's decision in *Bush* v. *Gore*, supra, 531 U.S. 104–105. See *Hunter* v. *Hamilton County Board of Elections*, supra, 234 n.13. We disagree with the plaintiff's reliance on *Hunter*, even if we were to follow it instead of the Second Circuit case law that we generally follow in cases of circuit splits. See, e.g., *Gleason* v. *Smolinski*, supra, 319 Conn. 444 n.41. Indeed, *Hunter* is factually distinguishable because it concerned an election board's lack of coherent or consistent standards for the treatment of provisional ballots, rather than an isolated error like the one at issue in the present case. See *Hunter* v. *Hamilton County Board of Elections*, supra, 234–37; cf. *Northeast Ohio Coalition for Homeless* v. *Husted*, 696 F.3d 580, 597–98 (6th Cir. 2012) (finding sufficient evidence of purposeful conduct given state's "intent to enforce its strict disqualification rules without exception, despite the systemic poll-worker error identified in this litigation and others," which had "result[ed] in the rejection of thousands of provisional ballots each year").

The Supreme Court's decision in *Bush* is similarly distinguishable because, in that case, the court concluded that an equal protection violation occurred when, during a recount procedure, "each of the counties used varying standards to determine what was a legal vote. Broward County used a more forgiving standard than Palm Beach County, and uncovered almost three times as many new votes, a result markedly disproportionate to the difference in population between the counties." *Bush* v. *Gore*, supra, 531 U.S. 107. In addition, the state officials in *Bush* used "variant standards" to determine which votes would be counted, and, as the result of the certification deadline that had been imposed by the Florida Supreme Court, one county had completed only a partial count. Id., 108. We conclude that *Bush* is readily distinguishable because that case involved a state's widespread application of arbitrarily varying standards in determining the intent of the voters. That decision does not stand for the proposition that *any* unintentional mistake by an election official that casts doubt on the result of an election violates the United States constitution.

Thus, we also disagree with the plaintiff's reliance on *Butterworth* v. *Dempsey*, 229 F. Supp. 754 (D. Conn.), aff'd sub nom. *Pinney* v. *Butterworth*, 378 U.S. 564, 84 S. Ct. 1918, 12 L. Ed. 2d 1037 (1964), and the decision that followed on remand, *Butterworth* v. *Dempsey*, 237 F. Supp. 302 (D. Conn. 1964), for the proposition that, "under *Baker* v. *Carr*, [supra, 369 U.S. 186], a claim made under the federal constitution cannot be limited by the state constitution." That case is distinguishable because it involved a challenge to our state's legislative districting in light of recently announced one person, one vote principles, and the need for a state constitutional convention and redistricting sooner than provided by the Connecticut constitution. See *Butterworth* v. *Dempsey*, supra, 237 F. Supp. 306–307. Thus, the allegation at issue in that case involved an equal protection violation that had been imposed de jure, rather than the limited challenge to a flawed election at issue in the present case. See *Westchester County Independent Party* v. *Astorino*, 137 F. Supp. 3d 586, 619–20 (S.D.N.Y. 2015) (noting distinction between "[l]aws that by their own terms burden the fundamental rights of

minority groups [that] raise particular concerns of invidious discrimination" and cases alleging "[u]neven or erroneous application of an otherwise valid statute [that] constitutes a denial of equal protection only if it represents intentional or purposeful discrimination" [internal quotation marks omitted]).

[40] We disagree with the plaintiff's reliance on this court's decision in *Office of the Governor* v. *Select Committee of Inquiry*, supra, 271 Conn. 540, for the proposition that the expiration of an underlying statutory deadline renders moot an appeal challenging a temporary injunction ordered prior to that deadline. In *Office of the Governor*, this court noted that our state House of Representatives had obliged the select committee to report its findings and recommendations on or before June 30, 2004. Id., 548–49. This court scheduled oral argument of the appeal for June 18, 2004, on the basis of a representation from the select committee that, if the court "were to hear the appeal on [that date], its proceedings would still be open as of that date, so that, as of that date, the case would not be moot." Id., 549. The court stated that it then "heard and decided" that appeal on June 18, 2004, and, "[b]ecause at that time the defendant was still in session, any question of mootness by operation of the passage of time, *which might have occurred* had this appeal been heard and decided at a later date, had been dispelled. The appeal, therefore, is not moot by virtue of the defendant's time frame for reporting to the House of Representatives." (Emphasis added.) Id. *Office of the Governor*, therefore, does not support the plaintiff's mootness analysis because, although this court expressed some concern about the potential for mootness caused by the passage of the June 30 deadline during the pendency of the appeal, it never concluded that the appeal would have been rendered moot by the passage of the deadline. Rather, the court simply observed that any potential mootness concerns had been alleviated by the scheduling of argument and the issuance of the court's decision in that appeal.

[41] The plaintiff cites a 1933 Attorney General's Opinion as standing for the proposition that there is "significance in the 'during the month' requirement." See Opinions, Conn. Atty. Gen. (May 1, 1933) pp. 147–48. We disagree with the plaintiff's reliance on that opinion, which was limited to whether an election to fill a probate judge vacancy may be held at the same time and same place as a vote for delegates to a constitutional convention. That opinion did not address the consequence, if any, of a failure to complete the canvass during the month of the election.

[42] Accordingly, we need not reach the merits of the defendants' argument that the trial court abused its discretion by granting a temporary injunction.

[43] We acknowledge the well established "strong presumption in favor of jurisdiction"; (internal quotation marks omitted) *State* v. *Evans*, 329 Conn. 770, 784, 189 A.3d 1184 (2018); as well as the fact that the textual commitment of jurisdiction over a matter to the legislative branch does not completely preclude courts from certain limited actions related to those proceedings. See *Kinsella* v. *Jaekle*, supra, 192 Conn. 723 ("[a] court acting under the judicial power of article fifth of the constitution may exercise jurisdiction over a controversy arising out of impeachment proceedings only if the legislature's action is clearly outside the confines of its constitutional jurisdiction to impeach any executive or judicial officer . . . or egregious and otherwise irreparable violations of state or federal constitutional guarantees are being or have been committed by such proceedings" [citation omitted]); see also footnote 27 of this opinion. Accordingly, we leave to another day the extent to which a trial court may have jurisdiction over an application for injunctive relief that is "incident to," or in aid of preserving the legislature's jurisdiction, such as if a state officer refused to canvass the votes or declare a winner in accordance with his or her duties under § 9-319, both of which appear to be ministerial duties necessary to furnish prima facie evidence of election results and to move the electoral challenge process to the legislature in order that it may exercise its prerogative to act as final judge of election returns pursuant to the elections clause. See *State ex rel. Morris* v. *Bulkeley*, supra, 61 Conn. 359 ("That part of the election process which consists of the exercise by the voters of their choice is wholly performed by the electors themselves in the electors' meetings. That part of it is often spoken of as the election. But it is not the whole of the election. The declaration of the result is an indispensable adjunct to that choice . . . because the declaration furnishes the only authentic evidence of what the choice is."); see also *Butts* v. *Bysiewicz*, supra, 298 Conn. 679 (The court concluded that a certificate of party endorsement under § 9-388 "is the only statutorily authorized means by which the [Secretary of the State] is permitted to recognize a party's endorsement of a candidate as its nominee.

The nomination evidenced by the certificate, in turn, is an essential predicate to the [Secretary of the State's] authority to place a candidate's name on the ballot. . . . Thus, in the absence of a valid certificate, the [Secretary of the State] has nothing upon which to act." [Citation omitted; footnote omitted.]); see also *Keogh* v. *Horner*, 8 F. Supp. 933, 934–35 (S.D. Ill. 1934) (federal district court lacked jurisdiction to issue writ of prohibition restraining governor from issuing certificate of election required by state law because issuance of certificate was ministerial duty, and to hold otherwise "would confer upon him the right to conduct and settle contests concerning members of Congress, when that power is expressly conferred upon the respective [h]ouse of Congress by the [c]onstitution of the United States"); *State ex rel. Wahl* v. *Richards*, supra, 44 Del. 573–74 (concluding that court had jurisdiction to issue writ of mandamus requiring trial court, sitting as board of canvass, to conduct recount in state election, noting that if plaintiff "appear[ed] before the [state house of representatives] armed with a certificate indicating his election, that body would still have the exclusive right to determine whether he was a duly elected member" and that "presentation of the certificate would bring the question before [that body] and would be pertinent evidence for its consideration in determining [the plaintiff's] rights"); *People ex rel. Fuller* v. *Hilliard*, 29 Ill. 413, 419–20 (1862) (elections clause did not deprive court of jurisdiction to compel canvassing board to issue certificate of election to candidate for state legislature because issuance of certificate was ministerial, noting that "sole purpose" of application for mandamus was "to procure the requisite evidence, to present to that body, of a prima facie right to a seat in it, independent wholly of the question of qualification").

———————————————————